# THE PEOPLE OF THE TERRITORY OF UTAH, RESPONDENT, *v.* CHARLES THIEDE, APPELLANT.[1]

1. MURDER.— UXORICIDE.—SUFFICIENCY OF EVIDENCE TO SUSTAIN CONVICTION.— In the prosecution for murder the evidence showed that defendant had illtreated his wife for several years; that defendant slept at his saloon, deceased at his residence near by; that at about 10 o'clock of the night of the killing she was seen sitting in front of defendant's saloon; at 12:30 A. M. defendant was asleep and was awakened with difficulty by two witnesses, and at the time had no bloodstains on his white shirt or vest, and none on his hands; that these witnesses left at about 1 o'clock A. M ; that defendant, between 1 and 2 o'clock A. M., told a man that he had found deceased murdered near the saloon; that defendant was in or near his saloon, which was lighted, until the killing; deceased's body was found about five feet from the corner of defendant's saloon; deceased's head was nearly severed from her body. Defendant stated that when he found his wife she said: "Oh, Charlie!" Physicians testified that it was impossible for her to have spoken after the wound was inflicted, and it was improbable if not impossible that the wound could have been made with a pocket knife, and highly improbable that it was made with a razor, but was of such a nature as would be

---

[1] Appealed to the Supreme Court of the United States March 27, and affirmed Nov. 11, 1895.

16

made with a large knife or similar instrument; a large knife used by defendant in the saloon was missing; blood was found on defendant's clothes and hands, and also on the door of the saloon. Defendant testified that he attempted to lift deceased's body and so got the blood on his hands. The evidence also showed that at the time a body of men known as the "Industrial Army" was encamped near by, among whom were many desperate men, but it was not shown that any of these men were near the saloon on that night, or were in any way connected with the crime, nor was any reason shown why defendant would not have heard the struggles and the screams of his wife if anybody else had committed the murder. The sheriff testified that defendant acknowledged having killed his wife. Defendant denied this statement, stating that he told the sheriff that "they had killed his wife." *Held,* that the evidence was sufficient to sustain a conviction for murder in the first degree; that the jury were justified in finding that the defendant was the person who committed the crime.

2. ID.—ID.—PREVIOUS MALTREATMENT OF DECEASED BY DEFENDANT.—MOTIVE.—Where in a prosecution for uxoricide, there is direct evidence that defendant continuously maltreated deceased, witnesses may testify as to having heard deceased screaming at her house; to having seen bruises on her face and body; to having observed her when she appeared alarmed and frightened, without further evidence connecting defendant with acts of cruelty toward her, causing her to scream, etc., as the sole purpose for which this testimony was offered was to show defendant's malice towards his wife and point out the motive for the homicide.

3. ID.—ID.—EXPERT TESTIMONY.—ADMISSIBLE EVIDENCE.—Where deceased's head was nearly severed from her body and expert testimony shows that the wound was inflicted with one stroke of a large knife or similar instrument, and that it could only have been inflicted by a strong person, evidence as to defendant's physical strength is admissible.

4. ID.—ID.—OPINION OF WITNESS NOT AN EXPERT.—TIME TO TAKE EXCEPTION.—A person who is not an expert, is competent to testify that certain stains resemble blood stains, and error can not be assigned where no exception was taken at the time.

5. ID.—ID.—DISCRETION OF TRIAL COURT.—CROSS-EXAMINATION.— IMPEACHMENT.—After the defense had rested, the prosecution asked the court permission to recall a witness of defendant for further cross-examination and to lay a foundation for impeachment, which permission was given and objection made by the defense upon the ground that it was incompetent, irrelevant and immaterial and not rebuttal. Which objection the court overruled. *Held, not error.*

6. ID.—ID.—MATERIAL TESTIMONY.—Where the manner of the homicide was such that the person committing the crime must have gotten blood on his clothes, and defendant at the time of the killing accused another of having committed the act, evidence that no blood was found on such person's clothes when examination was made the morning after the killing, is admissible.

7. ID.—ID.— CROSS-EXAMINATION.— Where, in a prosecution for uxoricide, the witness for the prosecution testifies that on a certain occasion, deceased came to her house crying, it is not error to refuse to permit defendant, on cross-examination to ask the witness concerning defendant's conduct towards deceased at a different time, as not being proper cross-examination.

8. ID.—ID.—ID.—It is not error to refuse to permit a witness to be asked on cross-examination, for the purpose of discrediting her testimony, whether her husband was not in the habit of whipping her, and whether she had not had trouble with him in regard to another woman, as there is nothing in these questions that would tend in any manner to impeach the witness or test her credibility.

9. ID.—ID.—TRANSCRIPT OF TESTIMONY AT PRELIMINARY EXAMINA-TION.—Under 2 Comp. Laws 1888, § 4883, providing that in homicide cases the testimony at the preliminary examination when taken by a reporter shall be transcribed and filed with the clerk of the district court within ten days after the close of the examination, the failure of the reporter to file the transcript of the testimony, does not prevent defendant from being put on trial where he did not claim he was prejudiced in not having a transcript of the reporter's notes, and did not ask for a continuance in order to secure them, and a trial under such circumstances is not a trial without "due process of law."

10. ID.—ID.—PRELIMINARY HEARING.—A preliminary hearing is: not connected with the trial; it is unknown to the constitution; it is no part of the grand jury system, and has no relation to the indictment. Irregularities and impartial hearing in no manner affects a case or determines the trial upon indictment.

11. ID.—ID.—CHALLENGES.—IMPLIED BIAS.—CHALLENGE FOR CAUSE.—2 Comp. Laws 1888, § 5022, embraces different causes for challenge to a jury for implied bias. Section 5024 provides, that in challenges for implied bias one or more of the causes must be charged. *Held*, that in a challenging for implied bias a challenge that " defendant challenges for cause " is properly denied as being too general.

12. ID.—ID.—ID.—PEREMPTORY CHALLENGE TO JUROR.—If a challenge to a juror for implied bias has been improperly denied, and defendant afterward peremptorily challenges the juror, he cures the error and cannot complain.

13. ID.—ID.—ID.—ACTUAL BIAS NO QUESTION FOR REVIEW ON APPEAL.—Where a juror is challenged for actual bias, an issue of fact is raised, and if no exception is taken to the admission or rejection of evidence upon the *voir dire* examination, the action of the trial court is final and conclusive and cannot be reviewed on appeal.

14. ID.—ID.—VOIR DIRE EXAMINATION.—2 Comp. Laws 1888, § 5024, disqualifying a juror who has formed or expressed an unqualified opinion as to defendant's guilt or innocence, does not disqualify him from testifying on *voir dire* examination that he had formed an " impression," but not an " opinion," as to defendant's guilt, and although it would take evidence to remove it, he could try the 'case impartially and would give defendant the benefit of the presumption of innocence.

15. ID.—ID.—ID.—IMPARTIAL JURY.—2 Comp. Laws 1888, § 5024, providing that a juror shall not be disqualified because he has formed an opinion based on newspaper report, if on oath he states he can act impartially on the matter submitted to him, is not in violation of the constitution of the United States, Amendment Six, which guarantees to an accused a trial by an impartial jury.

16. ID.—ID.—ID.—In a prosecution of a saloon keeper for murder a juror testifying on *voir dire* examination that the fact that

a person was a saloon keeper would influence him as to his credibility, is competent.

17. ID.—ID.—FAILURE TO ENDORSE NAMES OF WITNESSES ON INDICTMENT.—WAIVER.—Under 2 Comp. Laws, § 4925, requiring names of witnesses examined before the grand jury to be endorsed on the indictment, the failure to so endorse their names does not *per se* render them incompetent, as the defendant may take advantage of it before entering his plea by submitting a motion to set aside the indictment, and the failure to so endorse the names is waived by pleading to the indictment.

18. ID.—ID.—ID.—WITNESSES FOR PROSECUTION.—The prosecution is not required to deliver to defendant the names of the witnesses to be called by it where the statute does not require it.

19. ID.—ID.—JUROR AS INTERPRETER.—It is not reversible error for the court at the request of the prosecution to permit a juror to act as an interpreter, where defendant and his counsel consent, even though it be admitted that a juror while acting as an interpreter, is a witness, where there is no pretense that the juror acted other than honestly and fairly and there is no claim that his interpretation was faulty or biased.

20. ID.—ID.—CHARGE TO JURY.—EXCEPTIONS.—Exceptions to the charge taken by the defense after the discharge of the jury and without the consent of the prosecution can not be considered on appeal. As it is the duty of counsel to seasonably call the trial court's attention to those portions of the charge thought to be error, or prejudicial, so that it may correct the error, if made, and the failure to do this is such a waiver that the party will not be heard to complain.

21. ID.—ID.—ID.—GENERAL EXCEPTION TO COURT'S CHARGE.—Exceptions to the court's definitions of the words " malice," " premeditation," " deliberation," without pointing out wherein the error lies is too general to be considered on appeal.

22. ID.—ID.—DIFFERENT DEGREES OF MURDER. — PROVINCE OF JURY.—It was the duty of the court to define murder and its degrees, but not to hold as matter of law that the defendant was either guilty of murder in the first degree or innocent. It was the exclusive province of the jury to determine whether premeditation or deliberation existed.

23. ID.—ID.—REQUESTS FOR INSTRUCTIONS.—Where instructions are

asked in the aggregate it is not error to refuse them, if any are exceptionable, and it is not error to refuse instructions. already substantially given.

(No. 567.  Decided March 16, 1895.  39 P. R. 837.)

APPEAL From the District Court of the Third Judicial District.  Hon. George W. Bartch, *Judge.*

Charles Thiede was convicted of murder in the first degree.  From the judgment entered and from an order overruling the motion for a new trial and in arrest of judgment, he appeals.  *Affirmed.*

The opinion states the facts except the record shows the following: At 12:30 A. M. defendant was asleep in his saloon and was awakened with difficulty by Trusk and Johnson, and at. that time he had no blood stains on his white shirt or vest and none on his hands.  These two persons remained in the saloon until almost 1 o'clock A. M.  At about 2: o'clock A. M. the physician arrived.  The physician testified that when he arrived the deceased had been dead. probably two hours.

*Messrs. Cherry & Cherry,* for appellant. .

Appellant contends that he was not tried by "due process of law."  The statutes of Utah, 2 Comp. Laws 1888, § 4883, provides in substance that the evidence taken at the preliminary hearing be filed with the clerk of the court, and if taken in shorthand that it be transcribed and filed as aforesaid, and the original notes filed, etc., § 4883, subdiv. 5 Comp. Laws Utah, 1888, neither of which was done in this case.  The defendant and his counsel had a right to examine and copy said evidence.  It remained in the hands of the officers of the law, and yet the defendant was deprived of its benefit.  The statute in this.

respect seems to be mandatory. Was the defendant put upon his trial by due process of law? Due process of law is the law of the land. We claim that this was a substantial right of which the defendant was deprived, and he thereby did not have a fair and impartial trial. Bishop Crim. Pro. § 145; *State* v. *Daherty,* 60 Me. 509; *State* v. *Beswick,* 13 R. I. 211; *Westervelt* v. *Gregg,* 12 N. Y. 202; 18 Howard, 276; 96 U. S. 101.

The district attorney did not furnish the defense with a list of the witnesses' names; those who gave the most damaging testimony were withheld and sprung as the trial progressed. To say the least, this was an unfair advantage, and tends to corroborate the claim of defendant that he did not have a fair and impartial trial. *Logan* v. *U. S.,* 144 U. S. 303. Favour, one of the jurors, on his *voir dire* admitted that he had read newspaper accounts of the murder and had had conversations with other persons, and that opinions were expressed. He admits that it would require an effort on his part to be a fair and impartial juror. The court erred in overruling defendant's challenge to this juror for cause. An unbiased and impartial jury is the crowning glory of the law; it is the safety of the imperiled citizen when arraigned before a tribunal, and when the issue is life or death how important that the accused should have the protection of this shield. Should there be any doubt as to the juror's fitness, the benefit should be given to the defendant. *Morton* v. *State,* 1 Kan. 438; *State* v. *Cleary,* 40 Kan. 287. That the juror on further examination by the court or counsel for the people states that he believes he could fairly and impartially try the case, and would be governed by the evidence, and disregard his opinion, does not make him a qualified juror under the sixth article of the federal constitution, which guarantees a "speedy and public trial before an impartial jury  *  *  *." A juror who has an opinion

"very strong," and which would require evidence to remove, is not the fair and impartial juror the law contemplates. *State* v. *Murphy,* 37 P. R. 420 (Wash.); *Holt* v. *People,* 38 Mich. 739; *State* v. *Miller,* 29 Kas. 43; *State* v. *Beatty,* 25 P. R. 899; *Young* v. *Johnson,* 25 N. E. R. 363; *Coughlin* v. *People,* 33 N. E R. 1 (Ill.); *Miller* v. *State,* 45 N. W. R. 451 (Neb.); *Owens* v. *State,* 49 N. W. R. 226 (Neb.); *Rose* v. *State,* 2 Wash. St. 310; *People* v. *Brown,* 72 Cal. 390. A person who is so prejudiced against the business of a saloon keeper or brewer that he believes that he could not give the same credit to his evidence as a witness as to persons in other vocations, is not an impartial juror. *People* v. *Larbuia,* 28 N. Y. Sup. 579; *People* v. *Mahoney,* 26 N. Y. Sup. 257.

The court erred in admitting evidence that during the four years preceding the homicide, the deceased was seen at night weeping and hiding on the road; that she was heard to scream; that she visited her neighbors weeping and that her face and body were bruised and discolored, without connecting any of these things with the defendant or showing that he was even cognizant of them. The prosecution did not presume to attempt to connect the defendant with their commission. *People* v. *Hancock,* 7 Utah, 170; *State* v. *Ching Ling,* 18 P. R. 844 (Oregon); *Territory* v. *Amijo,* 37 P. R. 1113 (N. M.); *McBride* v. *People,* 37 P. R. 953 (Colo.); *Philips* v. *State,* 22 Tex. App. 139; *State* v. *Weaver,* 11 N. W. R. 675 (Iowa). The defendant on trial for his life was denied the protection which the law of evidence affords to the humblest suitor in a civil action. Witnesses were led into exaggeration and allowed to repeat again and again circumstances which inflamed the jury against the defendant. An examination of the record shows that defendant did not have a fair and impartial trial. The law of evidence was suspended and the defendant forced to submit to the exigencies

which the extremity of the prosecution's case demanded. Had the fundamental and long established principles of evidence been followed, the jury may have rendered a different verdict. Soderholm and wife testified to acts of cruelty by defendant towards deceased. When defendant sought upon cross examination to affect the credibility of these witnesses, he was denied the right. The defendant had a right to go into the history of the lives of these people in order to show that they were not worthy of belief. Thompson on Trials, §§ 450–460; *Real* v. *People,* 42 N. Y. 270–281; Greenleaf on Ev. (14 ed.), §§ 455–6–9; *People* v. *Worthington,* 38 P. R. 689. Lillie Birch was permitted to testify to seeing the deceased on the night before the homicide, and that she was crying, etc., thereby leaving the impression on the jury that there was domestic trouble, but when defendant attempted to explain this occurrence by showing by this same witness that on the evening of the homicide their relations were friendly and cordial, he was at once stopped. This was error.

The charge relating to the crime of murder in the second degree and of manslaughter was inappropriate in this case, as there was not a word of evidence tending to show the commission of either of these offenses. "If the instructions are not based upon the facts which the evidence tends to prove, and also have a tendency to mislead, the judgment will be reversed because they were given, although they were correct, as abstract propositions." Amer. & Eng. Enc. of Law, vol. 11, p. 248, and cases cited; *Garden* v. *Richmond,* 83 Mo. 436. "Where a case is close in its facts, or where there is a conflict in the evidence on a vital point in the case, the rights of the parties cannot be preserved unless the jury are accurately instructed." *Steinmeyer* v. *People,* 95 Ill. 383. "When an instruction is palpably wrong, it cannot be aided by the general charge." *Rice* v. *Olin,* 79 Pa. St. 391; *Horn* v. *People,* 1

Kan. 47; *People* v. *Howard,* 14 Kan. 174. An instruction which is misleading and erroneous is presumed to have misled the jury to the injury of the defendant. *People* v. *Berlin,* 36 P. R. 199 (Utah); *People* v. *Hancock,* 7 Utah, 180, and cases cited; *Steinmeyer* v. *People, supra; People* v. *Gonzales,* 71 Cal. 569; Thompson on Trials, § 2326; also see dissenting opinion of Justice Smith in *People* v. *Berlin,* 35 P. R. 499 (Utah). The court concedes in the instructions that this is a case in which the prosecution rely on circumstantial evidence to secure a conviction; and in the charge to the jury, they are informed that this class of evidence "is of the same force and effect as any other;" then the court adds in effect, "provided it satisfies you that the defendant is guilty." The jury are then informed that they "need not be satisfied beyond a reasonable doubt of each link in a chain of circumstances relied on to establish the guilt of the defendant." The latter instruction had been condemned and disapproved by a great weight of authority and is rarely given in any modern court. In *Graves* v. *People,* 32 P. R. 63 (Col.), precisely the same instruction was given, as was in the case at bar; and in that case it was held that the giving of said instruction was reversible error. This being a well-considered opinion, we invite careful consideration of the same, and the cases therein cited. On the same question we refer to Thompson on Trials, § 2514; also *Clair* v. *People,* 10 P. R. 799; *Leonard* v. *Territory,* 7 P. R. 872; Am. & Eng. Enc. of Law, vol. 9, p. 734, and the large number of cases cited by the author; *Kollock* v. *State* (Wis.), 60 N. W. R. 817.

On the question of reasonable doubt, the charge to the jury is inadequate, very brief and erroneous; besides it is told to the jury in a negative form. They are informed what is not a reasonable doubt. Judge Sanderson in *People* v. *Lachanias,* 32 Cal. 433 says: " When the testimony

on a murder trial is entirely circumstantial, the defendant. is entitled to a full and clear instruction as to what the law means by a reasonable doubt. * * * " The court. further charged that the jury "should entertain such doubts only as arise from the evidence, and as you are able to find in the evidence a reason for." This we claim is neither law nor reason. A doubt more often arises. from a want of evidence than from the evidence. *Cowan* v. *State*, 35 N. W. R. 405 (Neb.); *Carr* v. *State*, 37 N. W. R. 630 (Neb.); *Morgan* v. *State*, 27 N. E. R. 710 (Ohio); *Rhodes* v. *State*, 27 N. E. R. 866 (Ind.); *Childs* v. *State*, 51 N. W. R. 837 (Neb.); *Roy* v. *State*, 50 Ala. 104. The court saw proper in his instructions to call attention to a confession, so-called, made by defendant to Sheriff McQueen. There was no confession, as McQueen misunderstood what defendant said, yet granting it to be a confession, the instruction. was wrong because it was not accompanied with any caution in reference to the reliance to be placed in extrajudicial confessions. This should have been done under all circumstances and by all means. Bishop Crim. Pro. § 1229; Wharton Crim. Ev. §§ 625–676; *Com.* v. *Howe,.* 9 Gray, 110; Roscoe Crim. Ev. p. 38; *Law* v. *Merrill,* 6. Wend. 268; *Malin* v. *Malin,* 1 Wend. 625; *U. S.* v. *Nott,.* 1 McLean, 499; *Nolin* v. *State,* 14 Tex. App. 474. "Weight of evidence of confession should be received with great caution." *People* v. *Borgetto,* 58 N. W. R. 328 (Mich.) The court gave an instruction on "motive," but it was entirely noncommittal; it merely told the jury they should consider the fact as to whether or not there was any motive in the mind of the defendant; failing to state that if the jury found from the evidence there was. no motive shown, that that fact presented a strong circumstance in favor of his innocence. *Clough* v. *State,* 7 Neb. 320. "The absence of all evidence of an inducing

cause to guilt, always affords, in such cases, a strong presumption of innocence." Burrill on Cir. Ev. 314. In the celebrated Babcock case, Justice Dillon, one of the ablest jurists who ever graced the supreme bench of the state of Iowa, said: "In all cases, and especially in cases depending on circumstantial evidence, an inquiry into the motives actuating the accused is always important because human experience shows that men do not commit crimes without a motive therefor." *U. S.* v. *Babcock,* 3 Dillon, 589.

One of the jurors offered himself as an interpreter. The defendant was asked in the presence of the jury to consent to the juror acting as an interpreter. Defendant could not object or refuse, as it would have offended the juror, so he consented, but it was gross error to permit the juror to act, as it deprived the defendant of a jury of 12 men. A juror after being sworn to try the cause, ought not to be permitted to take upon himself any other duty or burden than that imposed by his oath. We have been unable to find, in our researches, a single instance where this question has ever arisen before a court of last resort, and hence we reason from analogy and not precedent. It seems that no court has ever permitted a juror to so act, but it is well settled that an interpreter is a witness. 54 Cal. 527; Greenleaf on Ev. vol. 1, § 183; *Scherer* v. *Harber,* 36 Ind. 541. There were but eleven jurors acting while this juror was an interpreter and witness, and that was not a constitutional jury; and the defendant cannot waive or consent to less than 12 jurors. *Territory* v. *Ah Wah,* 1 P. R. 732, and cases cited; *Hill* v. *People,* 16 Mich. 357; *Cancemi* v. *People,* 18 N. Y. 136; Bishop Crim. Pro. §§ 88, 897–898; Thompson on Juries, §§ 5–7. It may be argued that defendant consented, but consent cannot cure error. The defendant was not free to choose, the demand having been made in the presence of the jury. Such consent

would avail nothing. *People* v. *Schafer*, 1 Utah, 260;. Thompson on Juries, §§ 271, 339, 998; Whart. on Crim. Pro. §§ 518, 733; Bishop Crim. Pro. § 121. When human. life is at stake, it is the duty of the court to interfere and see that the defendant is not deprived of a fair trial.. *Graves* v. *People*, 32 P. R. (Colo.) 63. "A conviction contrary to the weight of evidence will be set aside." *U. S.* v. *Duval*, Gilpin, 356; *Com.* v. *Ruggs*, 5 Pick. 429; *Falk* v. *People*, 42 Ill. 331; *Bedforth* v. *State*, 5 Hump. 553;. Wharton Crim. Pl. & Pr. § 813; Malone Crim. Briefs, p. 43S; *Schusler* v. *State*, 29 Ind. 394; *Horne* v. *State*, 1 Kans. 47.

*Mr. Andrew Howatt*, Assistant U. S. Attorney, *Mr. George L. Nye*, for respondent.

KING, J.

The defendant, Charles Thiede, was indicted for the murder of his wife, and on the 21st day of October, 1894, was found guilty, and on the 5th of November, 1894, his. motion for new trial and arrest of judgment was overruled, and sentence of death was passed upon him. From the judgment and order overruling his motion, he appeals to. this court. The record discloses numerous assignments of errors, and, as defendant's counsel urged each one with. ability and great earnestness, not only in his brief, but in. his oral argument, and because of the importance of the. case, we feel that the points presented demand careful consideration. We will not discuss the assignments in the order presented, but group them somewhat with reference to their chronological order in respect to the trial.

1. It is claimed that the evidence is insufficient to justify the verdict, and that the verdict is contrary to the. evidence and to the law, and that the court erred in over-- ruling defendant's motion for a new trial. This necessi-

tates a brief review of the evidence produced upon the trial. The undisputed testimony shows the following facts: The wife of the defendant was killed during the night of Monday, the 30th day of April, 1894. The defendant, about half past 1 or 2 o'clock in the morning, awakened Jacob Lauenberger, and informed him that he had found his wife with her throat cut, lying near the defendant's saloon. Upon examination by physicians of the wound upon the person of the deceased it was found that the head had been almost severed from the body by a wound in the throat, made by some sharp instrument. The wound extended inward to the vertebræ, which obstructed the further passage of the weapon. That from the character of the wound death was inevitable and immediate. It was highly improbable, if not impossible, according to the testimony of the physicians, that the wound could have been made with a pocket-knife, and highly improbable that it was made with a razor, but was of such a nature as would be made with a large knife, or similar instrument. The body of the deceased was found lying within 3 to 5 feet of the southeast corner of the defendant's saloon; and about 30 feet further east was a pool of blood, with evidence of a struggle, indicating that the deceased and her assailant had engaged in a struggle there, and that the deceased had received a serious, if not a fatal, wound at that place; and from that point to where the body lay there were blood marks, and another pool of blood where the body lay. The defendant was in or near the saloon during the night until he went with the witness Lauenberger to Murray for a physician, and the saloon was lighted during the whole of the night. The defendant had blood upon his hands and there was blood upon his clothing. The defendant, when he awakened Lauenberger, and thereafter, when going for a physician, and after his return, made manifestations of grief at the

loss of his wife. The defendant and his wife were about 33 years of age, and for several years prior to her death the husband had slept at his saloon, and his wife, with her child, about ten years of age, at the dwelling house, a short distance from the saloon.

A number of witnesses testified that the defendant ill treated his wife, and the course of treatment had continued for a number of years; and one witness testified that the defendant, about four months prior to the death of his wife, had expressed a desire to get rid of his wife, saying that she was too good for his business. The defendant was a witness in his own behalf, and denied the ill treatment, and denied that he had expressed a desire to get rid of his wife; and there were other witnesses introduced by the defendant, whose testimony tended to corroborate the defendant and contradict the testimony of some of the witnesses for the prosecution. We do not deem it necessary to review all the evidence on this point, but there certainly was sufficient evidence to warrant the jury in coming to the conclusion that the defendant and his wife had lived unhappily for years, and that the defendant had frequently abused and ill treated his wife, and that without any excuse, so far as the evidence discloses. The testimony on behalf of the prosecution shows that on Sunday evening preceding the murder the defendant and his wife, had quarreled in the garden, after dark; that they were called into the house of the witness Lauenberger; that when there the defendant slapped his wife in the face, and ordered her to go home, and that she refused to go, giving as a reason that, if she went home, the defendant would murder her that night; that soon thereafter she left Lauenberger's house, and the defendant and his child and the witness Lauenberger went to defendant's saloon; that while there the defendant's wife sought admittance to the saloon, which was denied by the defendant; that the defendant

and his child slept in the saloon that night; that about this time the defendant's wife went to the house of a neighbor, crying, and apparently afraid; that about 10 o'clock that night she was seen on the public highway, a short distance from the saloon, as if hiding and alarmed. On Monday morning the child went to school, and was told to go home with the teacher, and she remained with her Monday night.

The last seen of the defendant's wife by any witness other than the defendant was about 10 o'clock Monday evening, when she was seen sitting outside of the saloon of the defendant. During the night, about 1 o'clock, the defendant aroused the witness Lauenberger, and informed him that his wife had been killed. The night was very dark. Dr. Ferrebee, the physician called, testified that he was close to the body before he could discern anything, and had to touch it before he knew it was a human body. The witness Lauenberger testified that before going for a doctor, or alarming any one else than himself and wife, the defendant took a light, and scanned the outside of the south door of the saloon, and the side of the building adjacent thereto, as if looking for something upon the door and wall; that fresh spots of blood were found upon the outside of the door next day. Witnesses testified that the defendant said when he found his wife lying upon the ground that she said, "Oh, Charley!" while the only medical witnesses in the case all agreed that it was impossible for the deceased to speak or articulate after the wound was inflicted. One or two witnesses testified that, after their return to the saloon with the doctor, and after the body of his wife had been carried into the saloon, the defendant had gone several times from the saloon before daylight, remaining at one time as long as 20 minutes. It was testified that a large knife, used by the defendant in the saloon, was missing, and could not be found; and

it was testified to by the sheriff and his deputy that on the morning after the murder, when they went there, the defendant stated to the sheriff that he had killed his wife during the night. The defendant testified that when he found his wife lying upon the ground he undertook to lift her up, and so got the blood upon his hands and clothing; that when he undertook to raise her a sound was made like "Oh, Charley!" and that was what he said to the witnesses who testified that he said his wife said, "Oh, Charley!" He denies that he made the statement to the sheriff that he killed his wife, and says that what he said was, "They killed my wife."

The only question upon this branch of the case for us to determine is whether there is evidence in the record sufficient to support the verdict. It was for the jury to say whether they believed the testimony of the witnesses, and what weight they should give to the testimony of the witnesses for the prosecution and for the defense, and to the testimony of the defendant himself. There is certainly nothing in the record that would warrant us in saying that the jury should not have believed the testimony of the witnesses for the prosecution. There can be no doubt but that the defendant's wife was murdered, and, while the evidence was largely circumstantial, it certainly was sufficient to warrant the jury in finding that the defendant was the person who committed the crime. It appears from the evidence that a large number of men, belonging to what was known as the "Industrial Army," were camped less than a mile from the defendant's saloon; and it is claimed that there were many lawless men among them, and that their presence was sufficient to raise a doubt as to who committed the crime. But it is not shown that any of these men were near the saloon of the defendant that night, before the murder, or were in any

way connected with the crime; and the absence of motive, and the improbability of any of these men carrying upon his person a weapon such as would be likely to inflict such a wound, or committing such a crime within a few feet of a lighted building, and the likelihood that the defendant would have heard his wife's screams if anybody else had committed the murder, were matters for the consideration of the jury; and they could very properly say that, under the circumstances, the presence of these men in the neighborhood did not relieve the defendant from the effect of the evidence against him, but that the presence of these men furnished him with an opportunity to take his wife's life, and throw suspicion upon others than himself.

2. It is insisted that the court erred in admitting incompetent, irrelevant, immaterial, and hearsay evidence.

(a) In permitting certain witnesses to testify to hearing deceased scream upon numerous occasions, to seeing bruises upon her face and body, to seeing her cry upon several occasions, and to observing her when she appeared alarmed and frightened,—without connecting the defendant with the circumstances, or the alleged acts of cruelty towards the deceased. It is conceded by defendant's counsel that "in cases of marital homicide ill treatment and abuse by the husband to his wife may be shown in a general way for the purpose of proving malice or motive, but is incompetent for any other purpose." It is evident from the record that the sole purpose for which this testimony was offered was to show defendant's malice towards his wife, and point out the motive of the homicide. Psychic phenomena so often appear that scientists sometimes despair in their efforts to trace ordinary and natural sequence in mental concepts. Still the accepted rule must be that motive underlies human action. Uxoricide is unnatural. When it is charged, the first question suggested is, what

motive inspired the deed? It is a most material question to be determined. If no reason or motive is found, one is loath to believe even positive and direct evidence incriminating the spouse. In the case at bar, evidence of kindness and affection towards the deceased, exhibited by the defendant, would have been material, and would have proven of great weight in his behalf; conversely, cruel treatment and evidence of hatred and ill will would operate very strongly against him. Various witnesses testified to maltreatment, and circumstances from which the prosecution sought to draw inferences that defendant's treatment of his wife was cruel and inhuman. Was the defendant sufficiently connected with these acts and circumstances? The undisputed evidence was that defendant for years had not slept at home or with his wife. She had no relations in this country, was alone with her husband and their 10 year old daughter. Mr. Soderholm testified: That for about four years prior to the homicide he had resided within a few yards of the defendant's saloon and home. That shortly after taking up his residence there he saw the deceased one morning, running from her home, followed by defendant. She was screaming and attempting to escape from her husband. While so doing, defendant caught her, threw her down violently upon the ground, and kicked her, and dragged her by the hair of her head. Witness interfered, and defendant then ceased. He also testified: That very often,—as frequently as once a week,—from that time to the time of her death he had heard Mrs. Thiede crying and screaming at her home and the saloon when her husband would be there. That he had seen her, after dark, hiding near her home, when she appeared greatly frightened and agitated. Her face was always bruised, and often bloody. Before it had time to heal up it showed signs of renewed external violence.

Mrs. Soderholm testified that about $3\frac{1}{2}$ years before the trial she saw defendant beat his wife with a stick, and in October or November, 1893, about midnight, deceased's little girl ran to her home, and conveyed certain information, as a result of which witness and her daughter went to defendant's brewery, a short distance from his home and saloon. There they discerned deceased in the attic of the brewery, thinly clad. The night was very cold. She was softly crying to her daughter. Defendant was near, and when the witness and her daughter approached he drove them away, threatening to shoot them. She also testified to seeing deceased hiding, about 300 feet away from the saloon, one night when defendant was there. She was crying, and wringing her hands, and appeared to be greatly distressed. The witness further stated that she saw defendant chase his wife almost daily, and nearly every night when he was at home or at the saloon she could hear Mrs. Thiede screaming. The witness resided but a short distance from the saloon, described by her on the stand as being twice the length of the room in which the trial was being conducted. Mrs. Anderson, whose residence was very near the defendant's, testified to having seen bruises upon the deceased, and hearing screams from her home late at night; and about midnight, upon one occasion, she heard defendant and deceased near the saloon, and the latter was screaming. She also saw Mrs. Thiede, the night preceding the homicide, hiding near her home. Jacob Lauenberger and his wife testified that the evening before Mrs. Thiede's death, and before the time when Mrs. Anderson saw her hiding, she and defendant had a quarrel in the garden adjoining Lauenberger's home. Mr. Lauenberger invited the deceased into his house, hoping to terminate the quarrel. The invitation was accepted, but defendant followed his wife into the house, and there struck her in the face two or three times, and insisted

upon her going home. She refused, saying, "You will kill me tonight, if I go home." James Gilbert testified that about sundown on the evening that Mrs. Thiede was killed he was near defendant's saloon, and saw Mrs. Thiede run out of the saloon, looking very greatly alarmed and excited, and was followed by her husband. Other witnesses gave similar testimony to that given by the witnesses above named.

We think the objections to this testimony were properly overruled. The evidence shows that no person other than the defendant was in a position to have inflicted the injuries described upon the deceased. Besides, defendant is clearly and definitely identified with the bruises and mal-treatment to which the deceased was subjected. It was the province of the jury to pass upon and weigh the evidence introduced by the prosecution showing ill treatment; but the court, passing upon the admissibility of the testimony offered to show the injuries and bruises upon defendant's wife, had to assume that the testimony was true. Counsel cites several cases in support of his contention upon this point, but, aside from the case of *Territory* v. *Armijo* (N. M.), 37 Pac. 1113, they have no application whatever to the case at bar. In the case of *State* v. *Ling* (Or.), 18 Pac. 844, there was not the slightest evidence connecting the defendant with the homicide or previous circumstances from which it might be inferred that malice was entertained by some persons towards the deceased. *State* v. *Weaver* (Iowa), 11 N. W. 675 is cited. There two persons were jointly indicted for murder, and the court held that it was incompetent, upon the separate trial of one, to show threats made by the other, several months before the crime was committed, in the absence of any evidence tending to show a conspiracy, or any concert of feeling or action prior to the conflict resulting in the murder. The evidence in the case of *McBride* v. *People,*

(Colo. App.) 37 Pac. 953, showed that the deceased and
her husband engaged in frequent drunken carousals, but
failed to show the cause of her death. The *corpus delicti*
was not proven. As the court say: "In their periodical
drunken conflicts, she was undoubtedly the victim of vio--
lence and abuse. The external injuries, if inflicted by
him, may have affected, more or less, a person in a pros-
trate condition; but, there was an utter lack of evidence
that they caused death, and as to show how they were
received is left equally in doubt." The case of *Territory*
v. *Armijo, supra,* was strongly relied upon in the oral
argument as completely vindicating defendant's position
upon this question. It is not necessary to enter into a
discussion of that case. It is sufficient to say that, while
we do not assent to all the reasoning of the court, and to
all the conclusions reached, yet that is clearly distinguish-
able from this case, and does not announce a different
rule of evidence than that which governed the trial court
in the case at bar, and which we uphold.

(*b*) In permitting Dr. Benedict to testify that the de-
fendant was a strong man. The evidence was that
deceased's head was nearly severed from her body, and
that one stroke of the instrument employed had accom-
plished this. The witness was acquainted with the defend-
ant, and knew him to be possessed of great physical
strength. Such a stroke, it was contended by the prose-
cution, could only have been made by a person possessing
immense strength. While there are many strong men, yet,
in view of the nature of the wound, and the expert testi-
mony relative to the manner in which it was inflicted, we
think it was a circumstance, the value of which, slight
though it was, the jury were entitled to. Such testimony
might be not only relevant, but very material if the hom-
icide had been committed at a time and place ·when only
one strong person was in the neighborhood. Its import-

ance diminishes in proportion to the increased number of strong persons in the vicinity at the time of the homicide.

(c) In permitting the witness Montgomery to give his opinion as to how certain blood stains were occasioned. Counsel claims that he was not an expert, and therefore his testimony was incompetent. The record shows that no objection was offered, and no exception at any time was taken; but even if there had been, we think it would not have been error. A person not an expert is competent to testify that certain stains resembled blood, that the stains were blood, that certain hairs were human, and that a person was intoxicated. *Thomas* v. *State*, 67 Ga. 460; *McLain* v. *Com.*, 99 Pa. St. 86; *Com.* v. *Dorsey*, 103 Mass. 412; *People* v. *Hopt*, 4 Utah, 252, 9 Pac. 407; *Hopt* v. *Utah*, 120 U. S. 430, 7 Sup. Ct. 614.

(d) Appellant contends that it was error to permit the prosecution to recall defendant's witness Annie Thiede after the defense had rested. After the direct examination of the witness, in which she stated that the defendant was kind to his wife, the district attorney cross-examined her, and asked her some questions with a view to showing defendant's cruelty towards the deceased. Rebutting testimony was offered by the prosecution, and permission was asked of the court that this witness might be recalled for further cross-examination, and in order to lay a foundation for impeachment. Permission was given, and objection made by the defense upon the ground that it was incompetent, irrelevant, and immaterial, and not rebuttal. Witness was then asked, if she had not, at the time and place designated, made certain statements to Mrs. Soderholm concerning specific acts of cruelty upon the part of the defendant towards the deceased. It was not error in the court to permit this. Nor is there any merit in the two succeeding objections, wherein it is alleged that the court erred in permitting the witnesses Minnie Noble and

Mrs. Soderholm to testify to conversations had with the witness Annie Thiede, the proper foundation having been laid. These are matters resting largely in the sound discretion of the trial court. Careful examination of the record shows that there was no abuse of this discretion. It was a material question whether the defendant abused his wife, and, Annie Thiede having denied that her mother was in the attic of the brewery in the nighttime, under circumstances indicating that she had fled from the wrath of the defendant, as testified to by Mrs. Soderholm and her daughter, and the witness having further stated that she never saw her father whip or strike her mother, Mrs. Soderholm was recalled, and testified in substance that Annie Thiede told . her that defendant took the deceased from the attic and whipped her. This was not incompetent or hearsay evidence, nor was it collateral or immaterial, as counsel insists. It was properly admitted by the court.

· (e) Defendant made contradictory statements relevant to the manner in which the deceased met her death. He also told Dr. Ferrebee that a man, to whom he had sold whisky during the night of the homicide, and while his wife was lying dead in the saloon, had killed her. The evidence tended to prove that whoever killed the deceased must have been partially covered with blood. Dr. Ferrebee examined the man thus accused the morning following the homicide; and when on the witness stand as a witness for the prosecution the doctor was asked whether he had found any blood stains upon this person. His answer was in the negative, and permitting the answering of this question is assigned as error. This evidence only became competent and material in view of defendant's statement. He was endeavoring to exculpate himself, and in doing so sought to direct attention to others. Testimony that would tend to contradict and impeach him,

and at the same time explain away any circumstance tending to connect another with the killing, would be material. Certainly it would have been proper for the prosecution to have shown that this person accused by the defendant of having killed his wife was in a different part of the territory at the time of the homicide. The fact that several hours elapsed before the witness made the examination goes only to the weight of the evidence, and does not affect the question of its materiality.

(*f*) Complaint is made because a note, written by the witness last named while he was at the defendant's saloon, a short time after the homicide, was admitted in evidence. During the trial the defendant's conduct immediately after the homicide was inquired into. Witnesses for the prosecution were examined with a view to show that the defendant himself desired the presence of the sheriff. The note in question was written by Dr. Ferrebee, and read over to the defendant before it was transmitted. It contained a direction that the sheriff be sent for. This direction, the witness testified, was inserted without defendant's request, but, when read to him, no objection was offered. In the light of the testimony, and especially that which was elicited on cross-examination of the people's witnesses, this, while not very material, was not subject to the objections urged.

Lillie Birch, witness for the prosecution, testified that on the Sunday evening preceding the homicide deceased came to her home, weeping. On cross-examination she was asked if the following evening defendant and his wife had not appeared friendly towards each other. This was objected to, as not proper cross-examination, and the objection sustained. Appellant insists this was error. This exception is absolutely without merit. Witness testified to but one occurrence. If she had given evidence concerning general treatment of deceased by her husband,

another question would have been presented. To negative
maltreatment was a part of the defense. The witness
could have been called by defendant, but it is clear the
question was not proper on cross-examination. It is also
urged that error was committed in sustaining objections to
the questions asked Mrs. and Mr. Soderholm, witnesses
for the people. The questions asked of Mr. Soderholm, it
is apparent, were not propounded for the purpose of test-
ing his credibility, but to condemn him before the jury by
innuendo. The first question assumes that a man bearing
the same surname had a fight with his wife, and the
second assumes that some person had trouble with his wife
in Burgetown, growing out of his having some woman in
his room. These questions were not cross-examination,
had no relation whatever to anything concerning which
witness had testified in his direct examination, and they
assume facts in regard to which there was not even a sug-
gestion of proof. The questions asked Mrs. Soderholm
were clearly incompetent. Counsel asked her if her hus-
band was not in the habit of whipping her, and whether
or not she had not had trouble with him "in regard to
a woman being in the house." There is nothing in these
questions that would tend in any manner to impeach the
witness or test her credibility. The court asked defend-
ant's counsel whether these questions were put in good
faith. The reply was that he was relying upon informa-
tion received from defendant and others. Upon cross-
examination a witness may be asked any question which
tends to test his accuracy or credibility or to impair his
credit by compromising his character; but the extent to
which examination shall be allowed is in the discretion of
the court, and that discretion should be exercised in view
of the circumstances attending the trial, and the good or
bad faith manifested by the parties. 1 Thomp. Trials, §§
458, 461, 464; *People* v. *Larsen* (Utah), 37 Pac. 258. We

cannot say this discretionary power was abused by the court in passing upon the questions above referred to.

3. Defendant contends that the court erred in overruling his objection to going to trial on the 10th of October, 1894, for the reason that the evidence taken at the preliminary hearing had not been transcribed, certified, and filed with the clerk of the district court, as provided by law. Section 4883 of the Compiled Laws of Utah of 1888 provides, in substance, that in cases of homicide the testimony of each witness must be reduced to writing, or the magistrate before whom the hearing is had may, in his discretion, order the testimony and proceedings to be taken down in shorthand, and for that purpose may appoint a reporter. "The transcript of the reporter, when written out in longhand writing and certified as being the correct statement or the testimony and proceedings in the case, shall be *prima facie* a correct statement of such testimony and proceedings. The reporter shall within ten days after the close of such examination, if the defendant be held to answer the charge, transcribe in longhand writing his said shorthand notes, and certify and file the same with the clerk of the district court of the district embracing the county in which defendant was examined, and shall in all cases file his original notes with said clerk. The reporter's fees shall be paid out of the treasury of the county." When the case was called for trial, defendant's counsel "objected to going to trial," because the notes of the stenographer, taken at the preliminary examination of the defendant, had not been transcribed, certified, and filed with the clerk within ten days, or at all. The record shows that the stenographer who had reported the hearing had declined to transcribe his notes, because in similar cases both the county and territory had refused to pay him, and upon suit against the former it had been held that the county was not liable. It appears also that the

attorney for the people had requested a transcript, but the reporter had peremptorily declined to furnish it, and had come into open court and given his reasons for so doing. The defendant did not claim that he was prejudiced in not having a transcript of the reporter's notes, nor did he ask for a continuance in order to secure a transcript of them; and the record shows that he never made any request, either to the reporter or to the court, to be furnished with a copy of the testimony taken by the reporter.

The record seems to indicate that defendant's position was that he could not be put on trial at all, because the time had expired within which, under the statute, the reporter was to file a certified transcription of his notes with the clerk. It is now contended by the appellant that he was tried "without due process of law." We think defendant's position unsound. He was deprived of no right. The preliminary hearing is not connected with the trial; it is unknown to the constitution; it is no part of the grand jury system, and has no relation to the indictment. No matter what irregularities may have existed at the examination, even if defendant was there denied an impartial hearing, it would in no manner affect this case, or determine the trial upon indictment. Under our practice, an examination prior to indictment is not indispensable. Indeed, many cases are taken directly before the grand jury. If appellant's position is correct, the trial of a person charged with homicide, where an examination has been held before a magistrate, depends upon the reporter. If his notes are lost, stolen, or destroyed, or if through sickness, or for any other reason, he is unable to transcribe and certify to them within 10 days after the hearing, the defendant cannot be legally tried, as it would not be with "due process of law." It was not the intention of the legislature to postpone the trial of a person charged with homicide until he knew the testimony

against him. If so, the grand jury would have been required to divulge the evidence before them, or that body would have been forbidden to examine any case until a preliminary hearing had taken place, and the evidence there produced furnished the accused. It is not necessary to decide whether the statute is directory merely, or mandatory. If defendant had asked for a continuance in order to procure a copy of the testimony, or made any showing that he was being deprived of any right or advantage, or would in any manner be prejudiced in proceeding to trial, perhaps a different question might be presented than that here raised by the defendant.

5. Appellant assigns as error the overruling of his challenges for cause directed against the jurors Harris, Favor, Burton and Smith. The juror Harris, being examined on his *voir dire*, stated in substance that he had read an account of the homicide, at the time it occurred, in one newspaper, but had never heard or read anything concerning the case since. He had forgotten what was written, and the manner in which the deceased had come to her death. He had never talked with any person concerning the case, nor did he form or express an opinion. He had, however, heard persons, whose names he had forgotten, express an opinion as to the guilt or innocence of the defendant. He had an impression as to defendant's guilt or innocence from the account read. It was, however, only a newspaper impression, although it would take evidence to remove it. The juror stated, however, that he could try the case fairly and impartially, and give the defendant the presumption of innocence. The juror Burton had read, in one newspaper only, a partial account of the homicide, and knew nothing except what he had read in the incomplete statement. He had no opinion concerning the guilt or innocence of the defendant,—"just an opinion as to the occurrence." In answer to the court, Mr. Burton stated that he could

entirely disregard what he had read, and any impression
or opinion that he had formed from it, and try the de-
fendant on the evidence produced.   C. S. Favor, upon his
examination, stated that he had read newspaper accounts
of the homicide, and that he had a strong impression
arising therefrom as to the guilt or innocence of the de-
fendant, and the fact that the homicide had been com-
mitted, but that his mind was entirely free from such an
opinion or conclusion; "that he could accord to the
defendant the full presumption of innocence in entering
upon the trial.   He had, however, an impression which
would take some evidence to remove, but would enter the
jury box [he hoped] unbiased."   The statute of the terri-
tory allows challenges to jurors for implied and actual
bias.   The provisions relating to this subject are found in
2 Comp. Laws Utah 1888, pp. 704, 706, and are as fol-
lows:   Section 241:   "A particular cause of challenge is:
(1) For such a bias as when the existence of the facts is
ascertained in the judgment of law, disqualifies the juror,
and which is known in this act as implied bias.   (2) For
the existence of a state of mind on the part of the juror
which leads to a just inference, in reference to the case,
that he will not act with entire impartiality, which is
known in law as actual bias."   For implied bias there are
eight grounds of challenge.   The only one necessary to be
referred to in this case is that which provides for chal-
lenging the juror when he has formed and expressed an
unqualified opinion or belief that the prisoner is guilty or
not guilty of the offense charged.

   Section 244 provides:   "That in a challenge for implied
bias, one or more of the causes stated in section 242 must
be alleged.   In a challenge for actual bias, the cause stated
in the second subdivision of section 241 must be alleged;
but no person shall be disqualified as a juror by reason of
having formed or expressed an opinion upon the matter

·or cause to be submitted to such jury, founded upon pub-
lic rumor, statement in public journals, or common noto-
riety; provided, it appear to the court, upon his declara-
·tion, under oath or otherwise, that he can and will, not-
withstanding such an opinion, act impartially and fairly
upon the matters submitted to him.    The challenge may
be oral, but must be entered in the minutes of the court
·or of the phonographic reporter." The challenges inter-
posed by defendant were too general, and did not raise
·any question for review by this court.    Defendant's mode
of challenge was, "Defendant challenges for cause."
This is insufficient.    *People* v. *Hopt*, 4 Utah, 249, 9 Pac.
·407.    If the jurors were challenged for implied bias, the
grounds upon which the challenge is placed must be stated.
*Hopt* v. *Utah*, 120 U. S. 430, 7 Sup. Ct. 614; *People* v.
*Hopt*, 4 Utah, 250, 9 Pac. 407; *People* v. *Cotta*, 49 Cal.
166.    If the challenge is for actual bias, the cause stated
·in the statute must be alleged.    *Hopt* v. *Utah*, and *People*
v. *Hopt, supra.*    Moreover, defendant peremptorily chal-
lenged the jurors Harris and Burton, and, under all
·authorities, if there had been error in overruling his
·challenges for cause, he could not now complain.    But,
·waiving the question as to the form of challenges and the
·last point suggested, and considering the matter upon its
·merits, we are of the opinion that the court properly
·overruled defendant's challenges.    It is clear the jurors
were not disqualified for implied bias, as they had neither
·formed nor expressed an unqualified opinion or belief as to
the guilt or innocence of the defendant, so that, if they
·were disqualified, it was because of actual bias.    Counsel
insists that these jurors were not impartial, and therefore
incompetent, and that the sixth amendment to the federal
·constitution, which provides for "a speedy and public
trial before an impartial jury," was violated.    If the jurors
·were incompetent, it was because of having read in "public

journals" an account of the homicide. They had not gone
to the extent of "forming and expressing an opinion upon
the cause." Illinois has a statute substantially the same
as section 244, *supra.* It was contended in the case of
*Spies* v. *People,* 122 Ill. 261, 12 N. E. 865, and 17 N. E.
898, that it was unconstitutional as being in contravention
of a provision of the state constitution providing for a
speedy and impartial trial in criminal cases. The defend-
ants claimed that a federal question was involved, and
carried the case to the supreme court of the United States.
Speaking of the constitutionality of the act, that court
say: "Without pursuing this subject further, it is suffi-
cient to say that we entirely agree with the supreme court
of Illinois in its opinion in this case, that the statute on
its face, as construed by the trial court, is not repugnant
to section 9 of article 2 of the constitution of that state,
which guaranties to the accused party in every criminal
prosecution a speedy trial by an impartial jury of the
county or district in which the offense is alleged to have
been committed. As this is substantially the provision of
the constitution of the United States upon which the
petitioners now rely, it follows that, even if their position
as to the operation and effect of that constitution is correct,
the statute is not open to the objection which is made
against it." *Spies* v. *Illinois,* 123 U. S. 170, 8 Sup. Ct. 21.

This section of our statute (244) has been passed upon
by the supreme court of the United States in the case of
*Hopt* v. *Utah,* 120 U. S. 430, 7 Sup. Ct. 614. One of
the jurors in that case was challenged for actual and
implied bias. He testified on his *voir dire* that he had
heard of the case through the newspapers, and read what
was represented to be the evidence, and also had talked
about it, so that he had formed a qualified opinion; but
he "could sit upon the jury, and determine the case,
without reference to anything that he heard." The trial

court held that he was competent. The court say: "By the express terms of the statute (section 244) he could not be disqualified as a juror for an opinion formed or expressed upon statements in public journals, if it appear to the court, upon a declaration under oath or otherwise, that he could or would, notwithstanding such an opinion, act impartially and fairly upon the matters submitted to him. We think that the evidence, or what purports to be the evidence, printed in a newspaper, is a statement in a 'public journal,' within the meaning of the statute, and that the judgment of the court, upon the competency of a juror in such cases is conclusive." *Reynolds* v. *U. S.*, 98 U. S. 145; *People* v. *Hopt*, 4 Utah, 250, 9 Pac. 407; *Spies* v. *Illinois*, 123 U. S. 131, 8 Sup. Ct. 21; *People* v. *McGonegal* (N. Y. App.), 32 N. E. 616; *People* v. *Wah Lee Mon* (Sup.), 13 N. Y. Supp. 767. But, conceding that the jurors mentioned possessed actual bias, there is no question presented for review in this court. An issue of fact was raised, and the action of the trial court, no exception having been taken to any ruling admitting or rejecting evidence upon the *voir dire* examination, is final and conclusive. 2 Comp. Laws Utah 1888, § 5085; *People* v. *Hopt*, 4 Utah, 250, 9 Pac. 407; *People* v. *Cotta*, 49 Cal. 168; *People* v. *Fong Ah Sing*, 70 Cal. 8, 11 Pac. 323; *People* v. *McGonegal, supra; Spies* v. *Illinois*, 123 U. S. 131, 8 Sup. Ct. 21; *State* v. *Pike*, 49 N. H. 399. The cases upon which counsel rely are not opposed to the views herein expressed. They present different questions, and most of them are decided upon statutes different from ours. Perhaps, a few years ago, before newspapers were so numerous, impressions and opinions founded upon reports contained in public journals would, in some jurisdictions, be deemed sufficient to disqualify a person for jury service.

6. It is further insisted that the court erred in over-

ruling defendant's challenge of Juror Smith. Counsel's challenge was for "bias and prejudice." Were it not for the importance of the case, we would not notice a challenge based upon a ground so general, and wholly unknown to the statute. Moreover, after this challenge was overruled, the juror was peremptorily challenged by the defendant. During the examination of this juror he was asked by defendant's counsel whether, if it would appear that defendant was engaged in the saloon business, at the time and prior to the homicide, it would have a tendency to prejudice or bias his mind against him, and the reply was that he did not have "that respect for or regard for that class of men that I would have for men of other occupations, generally, as men of a class." He further stated that, if the defendant went on the stand as a witness, the fact might have some weight in his mind as to his credibility as a witness; that he knew nothing of the case or about the defendant, and had no bias or prejudice against him, and no opinion of his guilt or innocence, and would not allow the fact that he thought less of a saloon keeper than men of other occupations, generally, to influence him in any way in passing upon his innocence or guilt, and that he could pass upon that the same as he would upon any other person. Under the statute there can be no question about the competency of the juror. It is not required that jurors close their eyes to just observations and experiences in life. It is their exclusive province to weigh the evidence, and determine the credibility of the witnesses; and they cannot be required to state in advance—as a prerequisite to competency—that they will give the same credit to one witness that they will give to another, or to one class of witnesses that they would to other classes. It has been intimated by the supreme court of Indiana that in the trial of a cause in-

volving the business of the defendant, who was a saloon keeper, a juror who stated that he was prejudiced against saloon keepers, and would not believe defendant as he would persons of other occupations, was not qualified; but the court limits the rule to cases concerning the occupation or business against which the juror is prejudiced. *State* v. *Dolan,* 23 N. E. 761. But in the case at bar defendant's business was not upon trial, and was not involved in the case. One of the jurors in the case of *Spies* v. *Illinois, supra,* in his *voir dire,* answered that he had a decided prejudice against communists and socialists. Defendants were not only communists and socialists, but anarchists. It was held that the court rightly overruled defendant's challenge to the competency of the juror, and that its finding was conclusive. See *Spies* v. *Illinois,* 123 U. S. 131, 8 Supt. Ct. 21; *DePuy* v. *Quinn* (Sup.), 16 N. Y. Supp. 710; *Fortune* v. *Trainor* (Sup.), 19 N. Y. Supp. 598; *People* v. *Carpenter,* 102 N. Y. 238, 6 N. E. 584; *Com.* v. *Poisson* (Mass.), 32 N. E. 906; *Stoots* v. *State,* (Ind. Sup.) 9 N. E. 380.

7. Appellant assigns as error the action of the court in permitting witnesses to testify whose names were not indorsed upon the indictment, and were not given in the list furnished by the district attorney prior to the commencement of the trial. On the day the case was set for trial, defendant's counsel, in open court, requested "as a favor, and not as a matter of right," that the people's attorney furnish him the names of all the witnesses to be called during the trial, before its commencement. The district attorney replied that he had no acquaintance with the case, but, as soon as he was advised that other witnesses than those whose names were indorsed upon the indictment would be called, he would inform defendant's counsel. So far as the record speaks upon this matter, this promise was fulfilled. Witness McQueen's name

appears upon the indictment, and no objection whatever
was made by defendant to the calling as witnesses of Carl
Soderholm, Eva Berg, and Lillie Birch.   The witness
Striker was called on the 15th of October.   Defendant was
notified on the 11th preceding that the prosecution would
call him as a witness, which was eight days before the
defense rested.   We are not directed to any statute requir-
ing that defendant shall be furnished with the names of
the witnesses called by the prosecution, and there is no
authority, so far as we are advised, for holding that no
person can be called as a witness for the people unless his
name is indorsed upon the indictment.   Section 4925, p.
686, 2 Comp. Laws Utah, requires the names of the wit-
nesses examined before the grand jury to be indorsed upon
the indictment before it is presented in court.   If this is
not done, the defendant may take advantage of it before
entering his plea, by submitting a motion to set aside the
indictment.   The failure to indorse the names of the wit-
nesses examined by the grand jury upon the indictment is
waived by the defendant by pleading to the indictment.
*People* v. *Symonds*, 22 Cal. 349; *People* v. *Lopez*, 26 Cal.
113; *People* v. *Jocelyn*, 29 Cal. 562.   No objection was
made to these witnesses testifying for the reason that their
testimony operated as a surprise to defendant.   In fact, in
most, if not all, points upon which they testified, defend-
ant introduced rebuttal testimony; and impeaching testi-
mony was produced, with a view to destroy the weight of
the testimony given by the witnesses whose evidence seemed
to be of great importance.   There is nothing in the record
to indicate that their testimony was unexpected by the
defense; no application for postponement was made in
order to meet their statements; and upon motion for new
trial no showing was made by affidavit or otherwise that
defendant was prejudiced by the failure to have their names
indorsed upon the indictment, or that their evidence was

false. But, aside from all this, there is nothing in our statute requiring the submission of the names of the people's witnesses to the defendant, or permitting only those witnesses to testify for the people whose names appear upon the indictment.

8. Appellant claims that the court erred in permitting Louis Gronosky, one of the jurors, to be sworn and act as interpreter during the trial for two of the witnesses. After the trial had been in progress several days, the prosecution called Jacob Lauenberger to testify as a witness in the cause. The witness spoke a peculiar and unusual dialect of the German language, and it was difficult to procure a competent interpreter. One Fritz Lomax was, with the consent of the defendant, sworn as interpreter. After some little testimony had been given through the interpreter, defendant's counsel stated that he was informed by the defendant and a member of the bar that the interpreter was not translating correctly the answers of the witness. The juror Gronosky spoke up, and said that several statements were not rightly interpreted. Thereupon he was asked by the district attorney if he understood fully the witness, and the juror answered affirmatively, and stated that he was willing to act as interpreter. The district attorney then asked the defendant's counsel privately, so as not to be heard by the court or jury, if the defendant would consent to the juror's acting as interpreter for the witness, to which counsel replied, "Make your statement openly to the court." The district attorney then stated that he had endeavored to find some person to interpret the witness, but had been unable to find one who could fully understand witness. Request was then made of the court that the juror might be permitted to act as interpreter. The defendant and his counsel, in open court, consented that the juror Gronosky might act as interpreter for the witness. Thereupon the court consented, and Mr. Gro-

nosky was sworn to act as interpreter for the witness. Later the wife of Jacob Lauenberger was called to testify by the prosecution, and defendant and his counsel again consented in open court that the juror should act as interpreter for her. Without leaving his place in the jury box, the juror acted as interpreter for these two witnesses. This was done with the consent of the defendant and his counsel, and no objection was made until after the case had closed, and the jury retired. Then defendant's counsel stated that he desired "to enter an objection and exception to the action of the court in permitting the juror Gronosky to act and serve as interpreter."

Counsel now contends that he was deprived of a trial by a constitutional jury of 12 men; that Gronosky, while acting as interpreter, ceased to be a juror. It is also claimed that the consent given was of no avail, as it was concerning a matter so vital that defendant could not waive it. Section 3879 of the Compiled Laws of Utah of 1888 provides that "the judge or any juror may be called as a witness by either party, but when this is done, it is in the discretion of the court to order a postponement of the trial, and that it be taken before another judge or jury." While this section is found in the civil practice act, section 5386 provides that the rules determining the competency of witnesses in civil cases are applicable also to criminal actions and proceedings. And it appears to have been the rule at common law that a juror could be called as a witness. Archb. Cr. Prac. & Pl. p. 150; *Rex* v. *Rosser*, 1 Car. & P. 648; *McKain* v. *Love*, 2 Hill, Lib. & Law, 506. In Mr. Pomeroy's edition of Archb. Cr. Prac. & Pl. is found a marginal note on page 150, which reads: "A juror may give evidence of any fact material to be communicated in the cause of a trial in a criminal prosecution. The jury may use that general knowledge which any man may bring to be subject-matter of the indictment,

without being sworn. But if any one of the jurors has a particular knowledge of the subject, as, for instance, as to the value of a watch in a case where it is essential to prove what it is worth,—he ought to be sworn, and ex-amined as a witness." We think, under the statute as well as authority, a juror may be called as a witness in a crimi-nal cause. The question, then, arises, is an interpreter a witness? Upon this point there seems to be no controversy, the opinion being that he is. *People* v. *Lee Fat,* 54 Cal. 527; 1 Greenl. Ev. § 183; *Schearer* v. *Harber,* 36 Ind. 541. It is argued that the juror, while acting as inter-preter, would be so engrossed that he could not fairly hear, weigh and determine the evidence; that he might easily give evidence undue weight and credit by being the medium of transmission; and that he might (and did in the case at bar) hear incompetent testimony. These and other objections of a like character are urged. We think there is no merit in them. The defendant could not have been prejudiced by permitting the juror to be the channel conveying the words to the court and jury. If he were not acting as interpreter, he could hear the words of the witness; if incompetent evidence were given, he would hear it. Instead of his forgetting the evidence, there would be more likelihood of his remembering it, when he had restated it as interpreter. He did not lose his iden-tity as a juror. We can see no difference between this case and one where the juror might have read for the other jurors some writing offered in evidence. Suppose a paper had been received in evidence, and a witness on the stand asked to read it, and, owing to some infirmity, he was unable to do so, and a juror sitting near should volunteer or be asked to read it to the court and jury. He might give undue emphasis to some words; he might be so "engrossed" in reading as to "not remember" its contents. To hold that this would remove him from the

position of juror, that it would leave a jury of but 11, and would be ground for a new trial, and especially when it was consented to, would be sacrificing common sense to sophistry and absurdity. There is no pretense that the juror acted other than honestly and fairly. It is not even hinted that his interpretation was faulty or biased. With this record upon this question, it would be a monstrous perversion of justice to hold that this action of the court was reversible error.

9. Appellant assigns as error certain portions of the charge of the court, and also the refusal of the court to give certain numbered instructions asked by the defendant. Defendant's counsel presented to the trial court nine pages of typewritten matter, paragraphed and numbered from 1 to 22, inclusive, upon which was indorsed the following: "Comes now the defendant, and requests the court to instruct the jury as follows." Then followed the signature of counsel, and the requests. When the judge had concluded his charge, defendant's counsel excepted to "the refusal of the court to give the instructions requested by defendant, being numbered 1, 2, etc." Then follow the numbers of all the paragraphs except three, the court having adopted them verbatim. Also to the instruction of the court defining "malice," "deliberation," and "premeditation;" and also to the "charge of the court in submitting the question of murder in the second degree to the jury, as not being justified by the evidence, and tending to mislead and confuse the jury." Thirteen days later, and 12 days after the jury had returned a verdict, and been discharged, without consent of the attorney for the people or permission of court, appellant's counsel took several general exceptions to the charge. They were, however, so indefinite, and so general, that, even if taken in time, they would prove unavailing, and would not be considered by an appellate court. It is the duty of coun-

sel to seasonably call the court's attention to proceedings in the trial thought to be error and prejudicial, so that the trial court can correct the error if made; and a failure to do so is such a waiver that the party will not be heard to complain thereafter. *Lewis* v. *U. S.*, 146 U. S. 379, 13 Sup. Ct. 136; *Alexander* v. *U. S.*, 138 U. S. 355, 11 Sup. Ct. 350; *Marks* v. *Tompkins*, 7 Utah, 435, 27 Pac. 6; *U. S.* v. *Carey*, 110 U. S. 52, 3 Sup. Ct. 424; *Railway Co.* v. *Jurey*, 111 U. S. 596, 4 Sup. Ct. 566. "The rule in relation to exceptions to instructions is that the matter excepted to shall be so brought to the attention of the court before the retirement of the jury, as to enable the judge to correct the error, if there be any, in his instructions to them, and this is also requisite in order that the appellate tribunal may pass upon the precise question raised without being compelled to search the record to ascertain it." *Hickory* v. *U. S.*, 151 U. S. 316, 14 Sup. Ct. 334; *Jacobson* v. *State*, 55 Ala. 151; Thomp. Trials, § 2394.

The exceptions to the court's definitions of the words "malice," "premeditation" and "deliberation" are also too general to raise any question for the consideration of the court. There was no attempt to indicate wherein there was error in the language of the charge. A bare statement that the court erred in defining "malice," without pointing out wherein the error lies, is too general. *People* v. *Hart* (Utah), 37 Pac. 331; *Holder* v. *U. S.* 150 U. S. 92, 14 Sup. Ct. 10; *Railway Co.* v. *Jurey*, *supra*; *Allis* v. *U. S.*, 15 Sup. Ct. 36. However, we have examined the portion of the charge defining these terms, and we find no error therein. This counsel practically concedes in his brief. And we think there was no error in charging upon the question of murder in the second degree. It was the duty of the court to define murder, and its degrees, but not to hold as a matter of law (in view

of all the testimony) that the defendant was either guilty of murder in the first degree or innocent. It was the exclusive province of the jury to determine whether premeditation and deliberation existed. They might have believed beyond all reasonable doubt that the defendant committed the homicide, and think it was done with malice, yet not have been convinced beyond all reasonable doubt that the defendant acted with premeditation and deliberation. The case of *People* v. *Hopt, supra,* presented such facts as to irresistibly lead one to the conclusion that, if the defendant committed the crime, he was guilty of murder in the first degree; yet the supreme court of the United States (*Hopt* v. *Utah,* 110 U. S. 582, 4 Supt. Ct. 202), speaking of the case, say: "It was for the jury, having been informed as to what was murder, * * * to say whether the facts made a case of murder in the first degree or murder in the second degree. It was competent for the judge to * * * inform the jury what the statutes defined as murder in the first degree and murder in the second degree."

Defendant complains because his requests were not all given. They were asked in the aggregate, and the rule is that, when so asked, and there is anything exceptionable in either of them, the whole may be properly rejected by the court. *Railroad Co.* v. *Horst,* 93 U. S. 295; *U. S.* v. *Musser,* 4 Utah, 166, 7 Pac. 389. A number of defendant's requests stated mere abstract principles of law, and had little, if any, application to the case; and two at least were not correct statements of the law. Most of them, however, were substantially given in the charge of the court. We think the entire case was covered in the court's charge, and that it was submitted properly to the jury. When this is done, the court may refuse to instruct further; and it may "use its own language, and present the case in its own way." *Railroad Co.* v. *Horst,*

*supra; U. S.* v. *Musser, supra.*     Admitting that the general exception taken to the refusal of the court to give defendant's requests was good, we are of opinion that the case was fairly presented to the jury.     We find no error in the record, and accordingly affirm the judgment of the lower court, and remand the case, with directions to the lower court to fix the day for carrying its sentence into effect.

MERRITT, C. J., and SMITH, J., concur.