Points decided.

[Decided Jan. 9, 1894.]

# STATE v. MOREY.

[S. C. 35 Pac. 655.]

1. HOMICIDE—DELIBERATION AND PREMEDITATION.—An instruction on a trial for murder, that the time occupied by defendant in going from one specified place to another was sufficient to afford him opportunity for deliberation and premeditation, is not erroneous, where the evidence shows that the defendant's mind was in its normal state, and that nothing had occurred prior to the killing to arouse his passion.

2. MURDER—INSTRUCTION ON DELIBERATION AND PREMEDITATION.—To constitute murder in the first degree, it is not necessary that the deliberate intent to kill should have been formed for any specific length of time prior to the commission of the act, but it is enough that it existed at the moment of the killing, provided that it was formed when the mind was in its normal state, under the control of the slayer, and not in the heat of passion; and ordinarily the question of whether there was deliberation will be left to the jury under all the circumstances of the case. Where, however, the conceded fact is that the defendant was not in any degree whatever excited or disturbed, and there was no question of cooling time in the case, the court may properly instruct the jury that the time required to walk from the street into the first story of a building was sufficient to afford opportunity for deliberation and premeditation.

3. INSTRUCTIONS TO JURIES—ASSUMING EXISTENCE OF FACTS.—Where there is any conflict in the evidence concerning the existence of any fact, the court ought not, in its instructions, to assume that such fact is or is not established; but when the uncontradicted evidence of the fact is clear and convincing, or when the fact is admitted, the court may properly assume that such fact is true, and frame the instructions accordingly.

4. HOMICIDE—SELF-DEFENSE.—The right of self-defense does not depend wholly upon the belief which the person claiming it entertained, but whether or not there was ground for a reasonable belief on his part that he was in danger of death or great bodily harm.

5. HOMICIDE—CHARACTER OF DECEASED.—If there is testimony tending to show that the defendant was assailed by the deceased, and was in apparent danger, the jury may consider that deceased was turbulent, violent, and desperate, in determining whether defendant had reasonable cause to apprehend great personal injury; but unless the defendant was, or believed himself to be, in imminent danger of death or great bodily harm, the bad character of the deceased is immaterial, since it is as great a crime to kill a bad man as a good one.

XXV. OR.—16.

6. REASONABLE DOUBT.— An instruction that "a reasonable doubt" is such a doubt as a juror can give a reason for is not reversible error, when given in connection with other instructions by which the court seeks to so define the term as to enable the jury to distinguish a reasonable doubt from some vague and imaginary one.

APPEAL from Multnomah: M. G. MUNLEY, Judge.

George Morey having been convicted of murder in the first degree appeals.          AFFIRMED.

*Mr. Henry E. McGinn (Messrs. Alfred F. Sears,* and *Nathan D. Simon* on the brief), for Appellant.

*Messrs. Geo. E. Chamberlain,* Attorney-General, and *John H. Hall (Mr. Wilson T. Hume,* District Attorney, on the brief), for the State.

Opinion by MR. JUSTICE BEAN.

The defendant was convicted in the circuit court of Multnomah County of the crime of murder in the first degree in killing one Gus Barry on the morning of the fifteenth of January, eighteen hundred and ninety-three, by shooting him with a pistol. The proof shows that previous to the homicide, the deceased, with his wife and Miss Wright, his sister-in-law, lived in a building in the city of Portland fronting upon and abutting Clay Street, containing three rooms, the one in front being occupied by the deceased and wife as a bedroom, immediately in the rear of which was the sitting-room, connecting with this room by double doors. In the rear of the sitting-room was another room, occupied by Miss Wright as a bedroom. The prisoner, who seems to have been a suitor of Miss Wright, was requested by her, two or three days before the homicide, at the suggestion of Mrs. Barry, to come and stay at the house nights, because the deceased

was' drinking, and it was feared he might assault and
beat his wife, as he sometimes did when under the influ-
ence of liquor.   On the night of the homicide the pris-
oner went to the house about half-past twelve or one
o'clock in the morning, passing in from the street through
an alleyway to the rear door, where he was admitted by
Miss Wright, of whom he inquired if deceased was in,
and, being answered in the negative, said, "I will see for
myself." He then walked through the hall and across
the sittingroom to the door of the bedroom of deceased
and wife, who were both in bed, opened the door, and
immediately thereafter the shooting occurred.  It is dis-
closed from the defendant's own testimony that up to the
time he entered the room of the deceased nothing had
occurred to arouse his passion or disturb his mind in any
way.   There is some slight variance between the evi-
dence for the state and the defense as to what occurred
after the prisoner entered the room, but it is of no con-
sequence on this appeal.   The court instructed the jury
fully upon the various aspects of the case, and in so doing
defined particularly and with care the deliberation and
premeditation necessary to constitute murder in the first
degree.

A short time after the cause was submitted, the jury
returned into court, and through their foreman asked
the following question: "Would the time which elapsed
while the defendant was going from the sidewalk into
the room where the shooting took place be sufficient to
give opportunity for deliberation and premeditation?"
to which the court answered, "It would." This is the
principal assignment of error relied upon for the rever-
sal of the judgment. The contention for the defendant is
that, while no particular time is necessary for deliberation
and premeditation, it was an invasion by the court of the
province of the jury to tell them, as a matter of law,

under the facts of this particular case, that any fixed time would suffice for deliberation and premeditation on the part of the defendant.   The argument is that while, as a conclusion of fact, the time occupied by the defendant in passing from the sidewalk to the room of the deceased may have afforded him sufficient time for deliberation and premeditation, although but a few moments elapsed, yet it cannot be so assumed as a matter of law, because its determination was peculiarly within the province of the jury under the evidence.

The crime of murder·in the first degree is defined by the statute to be the killing of a human being "purposely and of deliberate and premeditated malice."   To constitute this crime, it is essential that the deliberate and premeditated design to kill must precede the killing by some appreciable length of time, sufficient for reflection and consideration upon the matter, and the formation of a definite purpose to kill, and it matters not how short the time is if it is sufficient for that purpose.   The rapidity of mental action is such that the formation of a design may not occupy more than a moment of time, and it is sufficient if it is formed and matured while the mind is in its normal state, and under the control of the slayer, however brief the space of time may be.   In this case it affirmatively appears from all the evidence, both of the state and that of the prisoner himself, that during the time he was going from the sidewalk into the room of the deceased he was in possession of his usual faculties, and his mind was in its normal state, uninfluenced by passion or disturbed by any sudden and uncontrollable emotions, and under such circumstances we think it was not error to declare as a matter of law that the time occupied in so doing gave him opportunity for deliberation and premeditation, and this is all the court declares in its answer to the question propounded by the jury.

The question did not call for, nor did the court by its answer intimate, any opinion as to whether there was deliberation and premeditation, but only that the time which elapsed after the defendant left the sidewalk was sufficient to give him as a sane man in a calm and deliberate state of mind, as the evidence shows him to have been, an opportunity sufficient for that purpose, leaving the question as to whether there was deliberation and premeditation for the jury to determine under the law as previously given them.    Each of the other assignments of error have been carefully examined, but finding no error in the record we have no alternative but to affirm the judgment.                                  AFFIRMED.

### ON REHEARING.
[ 36 Pac. 573.]

Opinion by MR. JUSTICE BEAN.

2.   Counsel for defendant not only insist that we are in error in the former opinion, but that there are other questions in the case, not heretofore called to our attention, which they now earnestly press as reversible error. Concerning the question presented at the former hearing, we think it necessary to add but little to what has already been said.    To constitute murder in the first degree, it is not necessary that the deliberate intent to kill should have been formed for any specific length of time prior to the act, but it is enough that it exists at the moment of the killing, if it was formed when the mind was in its normal state, under the control of the slayer, and not in the heat of passion.    It is therefore clear that the killing of a human being in pursuance of a deliberate and premeditated design, formed during the space of time necessary to walk the distance mentioned in the question propounded by the jury, would be murder in the first

degree, and hence there was an opportunity afforded for such premeditation, if the mind of the slayer was in a condition to deliberate and premeditate. As the power to deliberate or premeditate is possessed only by those having a mind free from passion or excitement, it cannot be said, as a matter of law, that any given space of time would afford an opportunity to a given person for deliberation and premeditation, if there is any question as to whether his mind was so disqualified or disturbed. In such case the question as to whether there had been sufficient cooling time, and whether the mind was in a condition to deliberate and premeditate, would be for the jury to determine, and not the court. Hence, the answer of the court in this case, given to the question propounded by the jury, that the time occupied by the defendant in going from the sidewalk to the place of killing afforded him opportunity for deliberation and premeditation, would without doubt have been error, if there had been any evidence in the case showing, or tending to show, that his mind was not in its normal state, but disturbed or disqualified by passion or excitement, or had there been any question as to the sufficiency of a cooling time. But the conceded facts, as they appear in the record, show that defendant's mind was in its normal state, and not in any way disqualified by passion or excitement, and that nothing had occurred prior to the killing to arouse his passion or disturb his mind, and therefore there was no question of cooling time in the case, and the court had a right to assume, in instructing the jury, that his mind was in a condition to deliberate and premeditate.

3. It is settled law that when there is any conflict in the evidence as to the existence of any fact, the court cannot, in charging the jury, assume that such fact is or is not established, but when the evidence is clear and convincing upon the question, and there is no evidence to

the contrary, an instruction assuming it as true will not
work a reversal of the judgment: Thompson, Charging
the Jury, 74; *Koerner* v. *State*, 98 Ind. 7; *Hanrahan* v.
*People*, 91 Ill. 142  Now, in this case, the entire evidence
given on the trial is made a part of the record, and a
careful inspection of it fails to disclose any conflict as to
what occurred on the night of the homicide, up to the
time defendant entered the room where the killing took
place, nor is there anything therein from which even an
inference can be drawn that defendant was in a disturbed
or excited state of mind or in any way disqualified from
coolly and deliberately considering and reflecting upon
the contemplated act. This being so, the court had a
right, in answering the question of the jury, to assume
that defendant's mind was in the condition which the
evidence shows it to have been, and upon such conceded
facts it committed no error when it declared that he had
an opportunity to deliberate and premeditate during the
time he was walking from the sidewalk to the place
where the killing occurred. If, as was intimated at the
argument, it is probable the jury were prompted to ask
the question because they imagined some conversation
took place between the defendant and Miss Wright when
she admitted him into the house, which aroused his
passion, and caused him at that time to form the design
to do the killing, it was a supposition wholly unwarranted
by the evidence, and a mere matter of speculation outside
of the record, and for which we can afford no relief. Miss
Wright, Mrs. Barry, and the defendant, the only witnesses
who testified on this subject, all agree that when the defend-
ant entered the door he simply inquired of Miss Wright
if Barry was in, and, being answered in the negative, said
"I'll see for myself." In this there is nothing which
could in any way tend to arouse the passion or disturb
the mind of the defendant, and as the correctness of the

ruling of the court must be determined from the record alone, and as we can only reverse a case for error appearing affirmatively therein, we are all agreed that there is nothing in this question to warrant a reversal of the judgment.

4. Passing now to the other questions presented, it appears that there was some evidence which, in the opinion of the trial court, made it necessary to instruct the jury upon the law of self-defense, upon which the defendant requested the following instruction: "If you believe that the defendant was assaulted in such a way as to give him ground as a reasonably prudent man (making all due allowance for his condition at the time and for his mental and intellectual state and degree of intelligence,) in the condition in which the assault placed him, to apprehend a design on the part of the deceased to kill him, or to do him some great bodily harm, he would have the right instantly to defend himself, and, if necessary, to kill the deceased in such case; if you find such to be the facts you must find the defendant not guilty." And also: "The right of self-defense may be exercised if the danger which the defendant seeks to avert is apparently imminent, irremediable, and actual. The question of apparent necessity can only be determined from the defendant's standpoint, not that of the jury, not that of the court, but from the standpoint of the defendant himself. The defendant must be acquitted (of malicious homicide); that is, he can be convicted of no offense greater than manslaughter, if even of that, if he only defended himself to the extent to which, according to his honest convictions as affected by his particular individuality, defense under the circumstances appeared to be necessary." These instructions were refused by the court, except in so far as the principles therein embodied may have been given in the general charge, which was as follows: "The killing of a human being is justifiable

when committed by any person to prevent death or any great bodily injury being committed upon him. Homicide can be excused or justified on the ground of necessity alone. The necessity must be apparent, actual, imminent, absolute, and unavoidable, or the defendant must, from all the circumstances, have honestly believed it to be so. To excuse homicide the party must act under an honest and well founded belief that it is necessary to take life to prevent great bodily harm. It must be danger so urgent that the killing is absolutely or apparently necessary; and the danger must not have been brought on by the slayer. Imminent and apparent danger, means such overt actual demonstrations as would make the killing apparently necessary to his preservation from death or great bodily injury. The danger must be unavoidable according to the facts and circumstances as they honestly appeared at the time to the accused; but it is not necessary that the danger should in fact have existed at the time, if the defendant had reason to believe and did believe that it existed. Actual and real danger to the defendant's comprehension as a reasonable man, as it then appeared to him in good faith, is sufficient. That is to say, a person may safely act in good faith on appearances. His guilt must depend on the circumstances as they appeared to him at the time. But the apprehension must be on good ground, sufficient to reasonably satisfy the mind from appearances that death or great bodily harm was about to be inflicted upon him. If, under all the circumstances, he had reasonable grounds for apprehension, the killing would be justifiable, even though the appearances were false, and there was no design on the part of the deceased to take life or to do great bodily harm. But whether or not there was such reasonable appearance of danger, and whether or not the defendant honestly and in good faith acted upon it, and under the circumstances

had reason to believe that he was in imminent danger of death or great bodily harm, is a question for the jury to determine from all the facts and evidence in the case."

The contention of defendant's counsel, and the principle embodied in the instructions refused, as well as those given, to which the exception is directed, as we understand it, is that the real or apparent danger, sufficient to justify the taking of human life, is to be determined from the defendant's standpoint alone, and that if he honestly believed his life in danger, or that he was in danger of great bodily harm, and, acting under such belief, took the life of his supposed assailant, it would be excusable homicide. This theory bases the right of self-defense upon the belief of the person defending, and not upon the ground of such belief or the reasonable appearance of danger. We do not so understand the law. A recent writer on this subject has thus concisely stated the rule as supported by the great weight of authority: "In order to justify a homicide on the ground that it was committed in self-defense, it must appear that the defendant, at the time he caused the death of the deceased, was acting under a reasonable belief that he was in imminent danger of death or great bodily harm from the deceased, and that it was necessary for him to strike the fatal blow or to perform such other act causing the death of deceased, in order to avoid the death or great bodily harm which was apparently imminent": Kerr on Homicide, § 166, and authorities there cited. Under this rule and the authorities cited in its support the justification of a homicide on the ground of self-defense is not a question which depends wholly upon the belief which the defendant entertained, but the question is what was his belief, and whether, under all the circumstances, as they appeared to him at the time of the homicide, the jury think there was ground for a reasonable belief in his mind

that he was in danger of death or great bodily harm
Mr. Wharton advocates the doctrine that the question
of apparent necessity is to be determined from the defend-
ant's standpoint, but he says that it is only a non-negligent
belief in danger which will be an excuse for a homicide
committed under such fear: 1 Wharton, Crim. Law,
9th Ed. 490; 14 Central Law Journal, 263. If this is
anything more than stating in another form that it must
be a reasonable belief, we prefer to follow the path as
marked out by the great weight of authority. A man,
though in no apparent danger, might kill another
through fear, alarm, or cowardice, under the belief, hon-
estly entertained, that great bodily harm is about to be
inflicted upon him, and certainly it could not be claimed
that under such circumstances he would be justified in
so doing, because the belief would be an unreasonable
one and not justified by the circumstances in which he
was placed. The right of self-defense is founded on the
law of necessity, and can only be exercised when the
slayer is acting under a reasonable belief, arising from
the circumstances of the case as they appear to him, that
his life is in imminent danger or that he is in danger of
great bodily harm from some overt act of his assailant,
and that it is necessary for him to take life to protect his
own. The reasonableness of the defendant's belief was
to be determined from his standpoint, but it was a ques-
tion for the jury, as to whether he had sufficient grounds
upon which to base such belief. As we understand it,
the charge of the court above quoted is in conformity to
this principle, and was, therefore, free from objection.
By the expression, "actual or real danger to the defend-
ant's comprehension as a reasonable man," as used in
the charge, which is the only portion objected to, the
court did not, as counsel seems to claim, lay down the
rule that defendant's conduct was to be judged by the

standard of an "ideal reasonable man," but only that he must have acted under a reasonable belief in apparent danger, justified by the circumstances of the case. This is obvious from the remainder of the instruction, especially from what immediately follows, which is explanatory thereof. We conclude, therefore, that there was no error in refusing the instruction asked, or in that given by the court.

5.   The next assignment of error is in instructing the jury as follows: "When a homicide is committed under circumstances that it was doubtful whether the act was committed maliciously or from well-grounded apprehension of danger, it is proper that the jury should consider the fact that the deceased was turbulent, violent, and desperate in determining whether the accused had reasonable cause to apprehend great personal injury to himself, but the circumstances of the case must at least raise a doubt in regard to the question whether the prisoner acted in self-defense." It is claimed that the error of this instruction consists in prohibiting the jury from considering the evidence tending to show the turbulent, violent, and desperate character of the deceased unless they were in doubt whether the accused acted maliciously or from well-grounded apprehension of danger, and it is insisted that if the jury were in doubt upon either of these points it was their duty to acquit, and evidence of deceased's character was consequently superfluous. This is but a part of the instruction of the court upon that question, and while this manner of taking and saving an exception is to be commended, because it calls the attention of the trial court to the specific portion of the charge to which an objection is made, yet, in considering the question presented, on appeal, we must examine it in connection with the remainder of the instruction, which was as follows: "It is no excuse for murder that the

person murdered was a bad man, because in the eyes of
the law it is as great an offense to kill a bad man as a
good man, to kill a quarrelsome and brutal man as it is
to kill a mild and inoffensive man. And unless the
circumstances show that the defendant acted in self-
defense, or was in imminent danger, or believed himself to
be in danger, of death or grievous bodily harm, the bad
character of the deceased will not avail him." As thus
considered, the rule announced by the court was, in sub-
stance, that if the jury were in doubt from the circum-
stances of the case, independent of the deceased's character,
as to whether the defendant acted maliciously or from
well-grounded apprehensions of danger,—that is, acted
in self-defense,—it was proper for them to consider the
evidence tending to show the violent and desperate char-
acter of the deceased in determining the question, but
such evidence would not avail him unless they had some
doubt upon this question, for it is as much a crime in the
eyes of the law to kill a quarrelsome and brutal man as
a mild and inoffensive one. In other words, if the jury
believed that at the time of the homicide there was some
overt act on the part of the deceased indicating an intention
to assault the defendant, but were in doubt or were hesi-
tating as to whether such threatened assault gave him
reasonable grounds to apprehend death or great bodily
harm from the deceased, it was competent and proper to
consider the evidence of deceased's bad character in de-
termining whether defendant acted under a reasonable
apprehension of imminent peril, or maliciously, and this
seems to be the rule of law upon this question: Whar-
ton, Crim. Ev. § 69, *et seq.*

In *State* v. *Keene*, 50 Mo. 360, from which a portion of
the instruction objected to was evidently taken, Mr. Jus-
tice WAGNER says: "When the homicide is committed
under such circumstances that it is doubtful whether the

act was committed maliciously, or from a well-grounded apprehension of danger, it is very proper that the jury should consider the fact that the deceased was turbulent, violent, and desperate, in determining whether the accused had reasonable cause to apprehend great personal injury to himself." And in *People* v. *Murray,* 10 Cal. 310, from which the remainder was taken, it is said : "The rule is well settled that the reputation of the deceased cannot be given in evidence, unless at the least the circumstances of the case raise a doubt in regard to the question whether the prisoner acted in self-defense. It is no excuse for a murder that the person murdered was a bad man; but it has been held that the reputation of the deceased may sometimes be given in proof to show that the defendant was justified in believing himself in danger, when the circumstances of the contest are equivocal." In *State* v. *Bryant,* 55 Mo. 78, in considering this question, Mr. Justice WAGNER further says: "Whilst it is perfectly true that the character of the deceased affords no justification, and will not even palliate the crime, where it appears that the defendant was the aggressor, and provoked the altercation, still it frequently becomes of great importance in determining the degree and quality of the offense. A bad man, as well as a good one, is equally under the protection of the law, but in a case of homicide, where it is doubtful whether it was committed with malice or from a well-grounded apprehension of danger, it is necessary to take into consideration the fact that the deceased was desperate, violent, or dangerous. A peaceable, well-disposed man, although in anger, might excite very little fear, whilst the menacing attitude of a cruel, vindictive, and desperate person would cause the greatest apprehension, and justify a line of action in the one case which would be wholly unwarrantable in the other."

The theory upon which evidence of this nature is

admissible in cases of homicide, is that when the plea of self-defense is interposed, a danger which is apparently imminent is to be considered and treated as if it were actual, real, and imminent, and such apparent danger must necessarily appear more menacing when regarded with reference to the assailant's character for violence and brutality as well as his special animus to the accused. When, therefore, the evidence tends to show that the defendant acted under an honest apprehension of danger from some overt act of the deceased, he may put in evidence the ferocity, brutality, or vindictiveness of his assailant as tending to show that he had reasonable ground for such belief, and when the acts or intentions of the deceased in reference to the fatal encounter are equivocal or doubtful, such evidence becomes very important and material. But before it can be introduced, or considered by a jury, the testimony must at least tend to show that the defendant was assailed by the deceased, and in apparent danger, for the character of the deceased, however bad, will not of itself justify or even palliate the crime. We think there was no error in giving the instruction complained of, and that the court did not, as claimed by counsel, prohibit the jury from considering the evidence of deceased's character, unless they were in doubt as to his guilt or innocence, but in effect the instruction was, that if the jury were in doubt as to whether the killing was malicious or from well-grounded apprehension of danger, it was proper to consider such testimony as tending to show that his act was not malicious, but founded on a reasonable belief in imminent peril.

6. It is also urged that the court erred in defining a reasonable doubt. The definition was as follows: "A reasonable doubt, gentlemen, is that state of the case which, after an entire comparison and consideration of all the evidence, leaves the mind of the jury in that con-

dition that they cannot say that they feel an abiding conviction, to a moral certainty, of the truth of the charge. A reasonable doubt is not every doubt; it is not a captious doubt: it is such a condition of mind, resulting from the consideration of the evidence before you, as makes it impossible for you, as a reasonable man, to arrive at a satisfactory conclusion. It is not a consciousness that the conclusion arrived at may possibly be erroneous, but it is such a state of mind as deprives you of the ability to reach a satisfactory conclusion. A reasonable doubt is a doubt which has some reason for its basis; it does not mean a doubt from mere caprice or groundless conjecture. A reasonable doubt is such a doubt as a juror can give a reason for." The exception and argument are aimed only at that portion of the charge in which the court told the jury that "A reasonable doubt is such a doubt as a juror can give a reason for." Almost innumerable efforts have been made by the courts to define the expression "reasonable doubt," as used in the criminal law, but so far none of them have met with universal approval, or been remarkable for accuracy of expression or clearness of thought, and in many jurisdictions the courts have declined to enter into any explanation of what the term means, because it is believed the term itself is as well calculated to convey to the mind of the juror its own meaning as any definition which can be given, and that to try to give a specific meaning to the word reasonable is, as Mr. Stephen says, "trying to count what is not number, and to measure what is not space": Common Law, 262; *Miles* v. *U. S.* 103 U. S. 304. In this state, however, the practice prevails, in instructing juries in criminal cases, for the courts to attempt to define the term, and the familiar definition of Chief Justice SHAW in the celebrated Webster case is generally adopted. This definition, although it has been

criticised as not being strictly accurate, is perhaps more generally recognized as a correct and concise explanation of the term than any other to be found in the books, and, having been approved by this court (*State* v. *Glass*, 5 Or. 73; *State* v. *Roberts*, 15 Or. 196, 13 Pac. 896), trial courts should adopt it, rather than struggle for originality where precedent alone should govern. It is always safer to follow the plainly marked path than to venture on byways strewn with the wrecks of those who have unsuccessfully attempted to follow them, and this is particularly true when attempting to define a reasonable doubt.

The utmost confusion exists in the adjudged cases in this matter of definition, and instances abound in the books where the same definition has been held error in one jurisdiction and as correct in another, and this is even true in the same state. But the authorities all agree that a doubt, to be reasonable, must be actual and substantial, as contradistinguished from a mere vague and imaginary one, but they differ widely as to what is an accurate expression of the definition of such a doubt. This difference naturally grows out of the inadequacy of language to make plainer, by further definition or refining, a term the meaning of which is within the comprehension of every person capable of understanding common English. It would undoubtedly have been better and safer for the trial court in this case to have omitted from its definition that portion of the instruction to which the objection was directed, but, since it was given, we must decide whether it contained error prejudicial to the defendant. In *Cowan* v. *State*, 22 Neb. 519, 35 N. W. 405, and *Carr* v. *State*, 23 Neb. 749, 37 N. W. 630, it was held that an instruction defining a reasonable doubt as "a doubt for having which the jury can give a reason based upon the testimony," was reversible error, because it was calculated to and did mislead and confuse

XXV. OR.— 17.

the jury, but just how is not stated, unless, as can be inferred from the doctrine of the case of *Brown* v. *State,* 105 Ind. 385, 5 N. E. 500, cited in the opinion in *Carr* v. *State,* it was because the court limited the doubt to one arising from the evidence alone, (which is not so limited in the case at bar,) and which in the case referred to was criticised because such a doubt might arise from the want of evidence as well as from the evidence in the case, although it was held not reversible error. These Nebraska cases are the only ones to which our attention has been called or which we have been able to find in which such an instruction has been held error, except one from Alabama, — *State* v. *Ray,* 50 Ala. 104, — which is in direct conflict with the succeeding case reported in the same volume. In *Morgan* v. *State,* 48 Ohio St. 371, 27 N. E. 710, and in *State* v. *Sauer,* 38 Minn. 438, 38 N. W. 355, instructions substantially the same were criticised because they did not define, but themselves required definition, which might truthfully be said of any definition of a reasonable doubt heretofore given. But the objection did not in either case seem to impress the court as of any great importance.

In *People* v. *Stoubenvoll,* 62 Mich. 329, 28 N. W. 883, it seems to be conceded that the instruction that "what is meant by a reasonable doubt is, as the term implies, a doubt arising out of the facts and circumstances of the case, in maintaining which you can give a good reason," was not strictly accurate, but the court said it could have produced no practical consequences in the case, and refused to reverse on that ground. In 14 Central Law Journal, 447, it is said that a reasonable doubt "must be such that a jury can give a reason for," and Judge SPEER, in instructing the jury in the case of *U. S.* v. *Jackson,* 29 Fed. R. 503, and in *U. S.* v. *Jones,* 31 Fed. R. 718, says that "it is a doubt for which a good reason can

be given, which reason must be based on the evidence or want of evidence." So also in *People* v. *Guidici*, 100 N. Y. 503, 3 N. E. 493, which was an appeal from a conviction of murder in the first degree, the court held, that an instruction that a reasonable doubt was one "for which some good reason arising from the evidence can be given" was not error, and affirmed the judgment. In the course of the opinion Mr. Justice DANFORTH says that it has not been too strongly stated that all the authorities agree that "an undefinable doubt which cannot be stated, with the reason upon which it rests so that it may be examined and discussed, can hardly be considered a reasonable doubt, as such an one would render administration of justice impracticable": 3 Greenleaf, Ev. § 29, note, 14th Ed. And this, it seems to us, is in substance what the court said in the language complained of when read with the whole instruction of which it forms a part, and when so read it was evidently the result of a struggle by the court to so define the term as to enable the jury to distinguish a reasonable doubt from some vague and imaginary one. The particular language in question may be, and no doubt is, subject to the criticism that it does not define, but needs defining, but we do not think it could have misled or perplexed the jury when considered in connection with the remainder of the instruction. If every criminal case is to be reversed for some technical inaccuracy in the definition of a reasonable doubt, then indeed the "administration of justice becomes impracticable." Fully realizing the consequences of this decision, we have given the question presented the utmost care, and, finding no error in the record, have no alternative but to adhere to our former opinion.

AFFIRMED.