## STATE *r.* MEGORDEN.

88 Pac. 306.

APPEAL—REVIEWING RULING ON CHALLENGE TO JUROR FOR BIAS—HARMLESS ERROR.

1. The disallowing of a challenge for cause to a juror who was then peremptorily challenged will not be reviewed where the challenger was not obliged subsequently to accept an objectionable juror, which cannot happen until the peremptory rights have been exhausted and a disqualified juror is then forced upon him over objection.

JURY—CONSTITUTIONALITY OF STATUTE.

2. Section 123, B. & C. Comp., providing that, on the trial of a challenge for actual bias, although it appears that the juror challenged has formed or expressed an opinion from what he has heard or read, such opinion shall not be sufficient to sustain the challenge, but the court must be satisfied that the juror cannot try the issue impartially, does not conflict with Const. Or. Art. I, § 11, giving accused the right to trial by an impartial jury.

JURY—OPINION—ACTUAL BIAS.

3. A juror who testified that he was not acquainted with defendant; that he had read of the case and discussed it, but did not know whether the people with whom he talked knew all the facts; that he had formed an opinion which it would take considerable evidence to remove, but did not know that he had ever expressed it; that he would be willing, if he were on trial, to have one sit on the jury who was in the same frame of mind; that he could enter on the trial giving defendant the presumption of innocence; that he knew nothing about the case except what he had read or heard; that he had read about it at the time and had seen a little notice of it since; that his opinion was based on the truth of the report he had heard and if it developed on the trial that it was false he would not regard it as evidence in the case and could try the case impartially—is not disqualified: *State* v. *Miller*, 46 Or. 217, distinguished.

EXPERT—EFFECT AND SCOPE OF OBJECTION.

4. An objection to a question asked of an expert that it is "incompetent, irrelevant and immaterial, upon the ground that a proper hypothesis or foundation had not been laid for asking the question," goes only to the competency of the question.

EXPERT WITNESS—HYPOTHETICAL QUESTION.

5. Where an expert has examined a wound and described it to the jury, it is not necessary to propound in a hypothetical form a question as to its effect.

EXPERT—THEORETICAL KNOWLEDGE—COMPETENCY.

6. A regularly graduated, licensed and practicing physician is competent to testify as to the effect of a blow on a person's head as described by other witnesses, although he had never seen or treated a case of the kind.

WITNESS—LEADING QUESTIONS ARE DISCRETIONARY.

7. It is discretionary with the trial judge to permit or refuse leading questions, and where he permits such questions to be asked of children 14 and 18 years of age who are called as witnesses against their father on a trial for killing their mother, he has acted wisely.

INSTRUCTIONS MUST BE CONSIDERED AS A WHOLE.

8. Instructions to a jury must be considered as a whole, and, if they are substantially correct and could not have misled the jury, the judgment will not be reversed because some instruction considered alone may be subject to criticism.

REFUSING REQUESTS ALREADY COVERED.

9. Refusal to give specially requested instructions already covered by the charge given is not error, though such requests are correct statements of the law.

APPEAL—NECESSITY OF ERROR APPEARING IN THE RECORD.

10. Timely and proper exceptions must be taken in the trial court and properly preserved in the record on appeal before error predicated on instructions will be considered on appeal.

INSTRUCTION AS TO PRESUMPTION OF INNOCENCE.

11. Refusal to give an instruction in a criminal trial that the presumption of innocence "follows him in the trial of this case until the contrary is shown beyond a reasonable doubt" is not error where an instruction was given that defendant "is presumed to be innocent until the contrary is proven," the two being substantially the same.

INSTRUCTION AS TO MORAL CERTAINTY—HOMICIDE.

12. Refusal to give an instruction in a murder trial that the presumption of innocence "must be overcome by competent evidence which convinces you of his guilt to a moral certainty" is not error where an instruction is given that "moral certainty, only, is required, or that degree of proof which produces conviction in an unprejudiced mind."

DEGREE OF CRIME—INSTRUCTION AS TO REASONABLE DOUBT.

13. The question of reasonable doubt in a murder trial as to murder in the first degree is fully covered in an instruction that, if it should appear "beyond a reasonable doubt that the defendant had committed a crime which is included in the crime charged in the indictment, and there should still remain in your minds a reasonable doubt as to which degree

he is guilty of, then, in that case, the defendant is entitled to the reasonable doubt as to the higher crime or to the highest degree, and you can only return a verdict of guilty of the degree of the crime so included in the indictment as to which there is no reasonable doubt."

PROPRIETY OF INSTRUCTION ON INVOLUNTARY HOMICIDE.

14. A trial judge may with propriety refuse to instruct a jury as to the lesser grades of an offense charged unless there is evidence tending to show that the lesser offense was committed.

HOMICIDE—DELIBERATION—PREMEDITATION.

15. In a murder trial, there being some evidence that defendant's mind had been disturbed shortly prior to the killing, the court properly left the matter of time for deliberation and premeditation to the jury under an instruction that deliberation and premeditation must be evidenced by some proof that the design was formed and matured in cool blood.

INSTRUCTION NOT BASED ON FACTS.

16. An instruction which begins with a sentence inapplicable to the facts in a murder trial is properly refused.

CAUTIONARY INSTRUCTIONS USUALLY DISCRETIONARY.

17. Cautionary instructions in a murder trial, where there is nothing in the circumstances of the case making them necessary, are within the discretion of the court.

HOMICIDE—EVIDENCE OF DELIBERATION.

18. The evidence in this case is ample on the questions of deliberation and premeditation to support the verdict of murder, and for the court to have instructed the jury that the testimony was not sufficient on those points to justify a verdict of murder in the first degree would have been a clear invasion of the province of the jury.

From Malheur: GEORGE E. DAVIS, Judge.

Statement by MR. JUSTICE HAILEY.

The defendant Holiver Megorden was indicted in September, 1905, by the grand jury of Malheur County, Oregon, charged with the crime of murder in the first degree, in shooting and killing his wife, Mary Megorden, on March 28, 1905. A trial was had beginning on September 16, a verdict of guilty as charged was rendered, and the defendant sentenced to be hanged, from which sentence he has appealed to this court. The defendant and his wife had lived for 10 or 12 years near the town of Nyssa, Malheur County, Oregon, and for some years there had been considerable discord in their domestic affairs, and immediately prior to the homicide there had been talk of divorce and separation and a division of property between them. They had four children, a son Robert, about 18 years of age, a daughter

Olive about 14 years of age, and a younger son and daughter. On March 28, 1905, the defendant left home early in the morning and went to Vale, the county seat, returning in the afternoon. After leaving his team at home and getting a light lunch, he went to the town of Nyssa. He came back in the evening between 5 and 6 o'clock, and went into the kitchen of his home where his wife and four children were sitting, and the testimony of his son Robert and daughter Olive is to the effect that, shortly after he came in and took a seat, he asked his wife if she was going to cook for him any more. She replied that she had never said she would not, and he told her then that she would have to get out in the morning, to which she answered she would not do so, as she had as good a right as he to stay in the house. Thereupon he became angry and approached her in a threatening manner, using violent language and shaking his fist in her face, and his son Robert then stepped up and told his father not to strike his mother. Defendant then turned upon and struck the son; the mother and daughter pulled him off and he began striking at them. The son, having a small 22-caliber rifle near him, picked it up, and reaching over his mother and sister struck his father on the right side of the head with the barrel of the rifle, breaking the stock of the gun and making a wound, as described by the physicians who examined it, on the parietal bone, about 1½ or 2 inches in length, commencing at or near the coronal suture and extending backwards and downwards toward the right ear, and extending through the scalp to the periosteum. When the defendant was struck he fell, but whether or not the blow knocked him down, or he fell over a chair, is not clear from the evidence. However, he immediately regained his feet and went out of the kitchen into another room, where he procured a pistol from a trunk which he kept there. When he came out with the pistol, he immediately started after his son, who, with the other members of the family, had run out of the house at the command of the mother, and chased the son for about 100 yards and shot at him three times, but failed to hit him. He then turned and started after his wife and daughter

Olive who had run up the lane in another direction from the son, and, after pursuing them for about 300 yards, overtook his wife, who, finding she could not get away, turned around and ran toward him, saying, as testified by her son: "Don't shoot, Holiver, don't shoot." But he knocked her back from him with his left hand, "and pulled down and aimed, and shot her" in the breast, then turned and walked away. He then went to Nyssa, called on Dr. Taylor, and had him examine his wound, and also told him he had shot and "hit" or "hurt" his wife, and asked the doctor to go and see her. After he had shot his wife and walked away, the son Robert and daughter Olive went to their mother and found her dead, and carried her body to a neighbor's. Shortly thereafter defendant was arrested.

AFFIRMED.

For appellant there was a brief over the names of *King & Brooke, Frank Harris* and *R. J. Slater,* with an oral argument by *Mr. William Rufus King.*

For the State there was a brief over the names of *A. M. Crawford,* Attorney General, and *John W. McCulloch,* District Attorney, with an oral argument by *Mr. McCulloch.*

MR. JUSTICE HAILEY delivered the opinion of the court.

1. There are numerous assignments of error, but they can be grouped under a few heads. The first 17 assignments relate to impaneling the jury, and are based upon the action of the court in denying challenges for actual bias made by defendant. The defendant peremptorily challenged several jurors after his challenges to them for actual bias had been disallowed. After 11 jurors had been taken and before the last juror was called the defendant had exhausted all his peremptory challenges, but he accepted the last juror without challenge of any kind. It is now sought to review here the action of the court in disallowing the challenges for actual bias to such jurors peremptorily challenged. The erroneous overruling of a good challenge for cause, thereby compelling the use of a peremptory challenge, is not prejudicial error where it does not appear that the challenger was compelled

to accept an objectionable juror: 12 Ency. Pl. & Pr. 505. In
this case the challenger was not compelled to accept an objec-
tionable juror after exhausting his peremptory challenges, but,
on the contrary, the juror was accepted without question as to
his qualifications, and it must be presumed that he was qualified
in every respect. In *Ford* v. *Umatilla County,* 15 Or. 313, 324
(16 Pac. 33), the rule as stated above is approved and authori-
ties cited in support thereof. In *Holt* v. *State,* 9 Tex. App.
580, it is said: "Unless objection is shown to some one or more
of the jury who tried the case, the antecedent rulings of the
court upon the competency or incompetency of jurors who have
been challenged and stood aside will not be inquired into in this
court." The question here raised is exhaustively treated in *Log-
gins* v. *State,* 12 Tex. App. 85, where the gist of the matter is
tersely stated, as follows: "The simple question, after the per-
emptory challenges are exhausted, is: 'Is the jury which finally
tries the case impartial?' If so, we cannot imagine that the
accused has any just ground of complaint with regard to it.
All that the constitution, all that the law, requires and demands
is a trial 'by an impartial jury.' If he makes no complaint or
has no complaint to make of it as finally organized, the pre-
sumption is legitimate that it is impartial." Mr. Justice FIELD
in *Hayes* v. *Missouri,* 120 U. S. 71 (7 Sup. Ct. 352: 30 L. Ed.
578), says: "The right to challenge is the right to reject, not
to select, a juror. If from those who remain, an impartial jury
is obtained, the constitutional right of the accused is main-
tained": *Spies* v. *Illinois,* 123 U. S. 131 (8 Sup. Ct. 21: 31
L. Ed. 80). In *Wooten* v. *State,* 99 Tenn. 189 (41 S. W. 815).
the defendant had exhausted all his peremptory challenges when
11 jurors had been accepted and the twelfth juror was accepted
without objection or challenge. Defendant on appeal sought to
question the rulings of the lower court in disallowing his chal-
lenges for cause to the jurors whom he afterwards challenged
peremptorily, but the court held that, unless defendant was
forced to accept other jurors after exhausting his challenges,
the question of the competency of the jurors challenged per-

emptorily could not be raised. To the same effect is *State* v. *White,* 48 Or. 416 (87 Pac. 137-141), recently decided by this court.

2. It is suggested, however. that our statute (Section 123, B. & C. Comp.) providing that, upon the trial of a challenge for actual bias, "although it should appear that the juror challenged has formed or expressed an opinion upon the merits of the cause from what he may have heard or read, such opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially," is broader than the terms of Section 11, Article I of the state constitution, which declares: "The accused shall have the right to public trial by an impartial jury," and is therefore void. Similar statutes in other states have been held valid, and our statute is within the doctrine of such cases: *Spies* v. *Illinois,* 123 U. S. 169 (8 Sup. Ct. 21: 31 L. Ed. 80) ; *Jones* v. *People,* 2 Colo. 351; *Stout* v. *State,* 90 Ind. 1; *Teritory* v. *Bryson,* 9 Mont. 32 (22 Pac. 147) ; *Stokes* v. *People,* 53 N. Y. 164 (13 Am. Rep. 492) ; *Cooper* v. *State,* 16 Ohio St. 328; *People* v. *Thiede,* 11 Utah, 241 (39 Pac. 837). This court in *Kumli* v. *Southern Pac. Co.* 21 Or. 505, 510 (28 Pac. 637), has practically so decided.

3. The only question, then, for determination regarding the impaneling of the jury is whether or not any of the jurors who tried the cause were disqualified. Of the 12 jurors who tried the case, 9 were accepted without challenge. Of the three remaining, one, Pennington, although challenged for actual bias, was, after further examination by counsel for defendant, accepted, thus waiving his challenge. One of the jurors challenged for actual bias, Patch, testified in substance that he was not acquainted with the defendant, nor to any extent in or about the town of Nyssa. although he knew a few people around there; that he had read of the case and discussed it with people, but as to whether they knew all the facts or not he could not say; that from what he had read and heard he had formed an opinion,

but did not know that he had ever expressed it, and that it would take considerable evidence to remove it, but that, if he were on trial, he would be willing to have one sit on the jury who was in the same frame of mind as he then was; that he could enter upon the trial of the case giving the defendant the presumption of innocence; that he knew nothing about the case except what he had read and heard, and that he had read of it about the time the homicide occurred, some time in the spring; that he had seen a little notice in the paper about it since; that the persons with whom he talked about the case knew about the same amount of facts as he did, and his opinion was based upon the truth or falsity of the report he had heard, and, if it developed on the trial that the report was false, he would not hang to it as evidence in the case, but would disregard the report he had heard if it was different from the evidence. He also stated that he would have no difficulty in disregarding the opinion he had and trying the issue in the case impartially. The other juror Lofton testified substantially the same as to his qualifications, and, the challenges being disallowed, exceptions were saved.

The facts stated by these jurors are practically identical with the facts stated by the jurors in the case of *State* v. *Armstrong,* 43 Or. 207, 217 (73 Pac. 1022). That case and the cases therein cited from this court upon the same point are conclusive upon the point raised here. The challenges were properly disallowed. It is claimed, however, that the case at bar is within the rule of *State* v. *Miller,* 46 Or. 485, 491 (81 Pac. 365). In that case the defendant, having exhausted all his peremptory challenges, was compelled to take a juror who had a fixed and positive opinion formed from hearing at least part of the testimony given at the former trial by the widow of the deceased, and from hearing other witnesses at such trial detail the testimony given by them. In other words, he had formed his opinion from what he had heard from witnesses who claimed to know the facts and had testified to them at a former trial, and not from hearsay and newspaper reports, as did the jurors in this case. That case is not applicable here.

4. Drs. Hoople and Taylor, witnesses for the state, each testified that he had examined the wound on defendant's head, and described it, and were then asked as to what effect such wound would have on the mental condition of the person receiving it, to which question defendant objected as "incompetent, irrelevant and immaterial, upon the ground that a proper hypothesis or foundation had not been laid for asking the question." The objection was overruled, and an exception taken. The objection only goes to the competency of the question: *State v. Martin,* 47 Or. 282 (83 Pac. 849) ; Rogers, Exp. Test. § 23.

5. Each of the witnesses having examined the wound and described it to the jury, it was not necessary to propound the question in a hypothetical form: 8 Ency. Pl. & Pr. 764. The opinions of the witnesses were based on the facts previously testified to by them, and were admissible within the rule of *State v. Simonis,* 39 Or. 111-118 (65 Pac. 595), and *State v. White,* 48 Or. 416 (87 Pac. 140).

6. Dr. Prinzing was then called in behalf of the state, and testified that he was a regularly graduated, licensed and practicing physician, residing at Ontario, Oregon, and had been practicing five years. He was then asked what the effect of a blow on a person's head, describing it as detailed by the two preceding witnesses, would have as to dazing or confusing the person, and answered that it would affect his reasoning faculties for a few moments. Before answering, the witness stated that he had never seen or had a case so struck in that place. An objection to the question on the ground that the witness was not qualified as an expert was overruled. The point raised by this exception is whether or not want of experience in exactly such a case as the one in question is sufficient to disqualify a practicing physician and surgeon of general experience in his profession. Rogers, Exp. Test. § 52, says: "If the witness is a physician or surgeon, he is not incompetent to express an opinion, because of his want of observation of any case like the one in question. * * It is not necessary, to qualify a medical witness to testify as an expert on the subject of wounds, that he should have

actually seen the wound in question. His testimony may be
based upon a description of a wound given in court by those
who saw it.". The want of experience or knowledge of the par-
ticular wound in question would not affect the competency of
the witness, if otherwise qualified, but might lessen the weight
given to his testimony. In *People* v. *Thacker,* 108 Mich. 652-
660 (66 N. W. 562), it was held that a practicing physician, a
graduate of a college of medicine and surgery, and duly licensed
to practice, could testify regarding a case of poisoning, although
it did not appear that he had ever treated a person who had been
poisoned or seen one treated by other physicians. The court
therein quoted with approval from Rogers on Expert Testimony,
page 45, as follows: "A witness, otherwise qualified, may ex-
press an opinion on a matter pertaining to his special calling or
profession, although his knowledge of that particular matter has
been derived from study rather than from actual experience.
It is the doctrine of the courts that study of a matter without
actual experience in regard to it may qualify a witness as an
expert." And further, page 99: "The principle is well estab-
lished that physicians and surgeons of practice and experience
are experts in medicine and surgery, and that their opinions are
admissible in evidence upon questions that are strictly and
legitimately embraced in their profession and practice." The
witness in this case was regularly graduated in medicine and
surgery, and was duly licensed to practice his profession in this
state, and, being such, under the authorities above cited, he was
competent to give his opinion on the matter in question by virtue
of his general knowledge within the scope of his profession, al-
though he had no experience or special knowledge of the wound
in question.

7. The questions claimed by the defendant to have been lead-
ing could not have prejudiced him, for they all related to facts
that were practically admitted on trial, except certain questions
asked the son Robert and the daughter Olive. Considering the
youth of these witnesses, one being 18 years of age, and the
other 14, and the fact that they were testifying upon the trial

of their father for killing their mother, we think there was no
error in permitting such questions, and that the case is fully
within the rule in *State* v. *Ogden,* 39 Or. 195-202 (65 Pac. 449).
The testimony of Robert and Olive Megorden to the effect that
their mother did not pick up a stick in the beginning of the
trouble was clearly rebuttal of the statement made by the de-
fendant that his wife picked up a stick of stove wood when he
first began to talk to her on the evening of the homicide, and
that he was trying to get it from her when he was struck by his
son Robert.

8. Certain principles, well established by this court, are appli-
cable to the disposition of the questions raised upon the giving
and refusal of instructions in this case:   First, the instructions
must be considered as a whole, and, when so considered, if they
are substantially correct and could not have misled the jury to
the prejudice of the defendant, the judgment will not be re-
versed because some instruction considered alone may be subject
to criticism: *State* v. *Anderson,* 10 Or. 448; *State* v. *Hansen,*
25 Or. 391 (35 Pac. 976, 36 Pac. 296); *State* v. *Tarter,* 26 Or.
38, 43 (37 Pac. 53); *State* v. *Bartmess,* 33 Or. 110, 126 (54 Pac.
167); *State* v. *Gray,* 46 Or. 24 (79 Pac. 53); 1 Blashfield, Inst.
to Juries, 902.

9. Second, the refusal to give instructions covered by the
general charge is not error: *State* v. *McDaniel,* 39 Or. 161
(65 Pac. 520); *State* v. *Eggleston,* 45 Or. 346, 359 (77 Pac.
738); *State* v. *Gray,* 46 Or. 24 (79 Pac. 53); *State* v. *Smith,*
47 Or. 485, 487 (83 Pac. 865).

10. Third, timely and proper exceptions must be taken in
the trial court and properly preserved in the record on appeal
before error predicated upon instructions will be considered on
appeal: Blashfield, Inst. to Juries, 795; *Kearney* v. *Snodgrass,*
12 Or. 311-317 (7 Pac. 309); *State* v. *Martin,* 47 Or. 282-288
(83 Pac. 849).

Error is assigned in the refusal to give 21 separate instruc-
tions requested by the defendant, but it is unnecessary to note
each instruction refused, since most, if not all, of them applica-
ble to the case were covered by the general charge.

11. The first instruction refused was as follows:

"The law presumes the defendant to be innocent of any offense, and this presumption follows him in the trial of this case until the contrary is shown beyond a reasonable doubt, and, in order to warrant a conviction of any or either of the offenses I have named, this presumption must be overcome by competent evidence which convinces you of his guilt to a moral certainty, and, if the evidence in this case does not satisfy you beyond a reasonable doubt of the defendant's guilt of murder in the first degree, it is your duty, under the oath you have taken, to acquit the defendant of the charge of murder in the first degree."

It is conceded that a portion of this instruction was covered by the following instruction given by the court, to which no exception was taken:

"The defendant in any case is presumed to be innocent until the contrary is proven. In case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to be acquitted, and, in that case, your verdict should be 'Not guilty.'"

But it is claimed that this instruction did not go far enough, and that the court should have instructed the jury that the presumption of innocence continued until the jury reached a verdict. The instruction given was as broad in that respect as the one requested. The slight difference in the phraseology of the two instructions upon the presumption of innocence until the contrary is shown or proven beyond a reasonable doubt did not alter the meaning, which was the same in each. If any difference existed, it was in favor of the defendant in the last instruction given.

12. The question of "moral certainty" in the instruction refused, was fully covered by the following instruction given by the court:

"The law does not require demonstration, however; that is, it does not require such a degree of proof as, excluding the possibility of error, produces absolute certainty, because such proof is rarely possible. Moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced mind. This is called satisfactory evidence, and it is the only evidence which will justify a verdict of guilty."

13. The question of reasonable doubt of guilt of murder in the first degree was also fully covered in the following instruction given by the court:

"If it should appear to you from all the evidence in this case beyond a reasonable doubt that the defendant has committed a crime which is included in the crime charged in the indictment, and there should still remain in your minds a reasonable doubt as to which degree he is guilty of, then, in that case, the defendant is entitled to the reasonable doubt as to the higher crime or to the highest degree, and you can only return a verdict of guilty of the degree of the crime so included in the indictment, as to which there is no reasonable doubt."

The instruction refused, being substantially covered by the general instructions of the court, there was no error in refusing it.

14. The court refused to give a requested instruction defining murder in the first and second degrees, and manslaughter by voluntary killing, and manslaughter by involuntary killing. In his general charge the court defined the different degrees of murder and also manslaughter by voluntary killing, and it is admitted the definitions were proper, but it is insisted that the court should have instructed, also, upon involuntary killing as defined by our statute:

"If any person shall, in the commission of an unlawful act, or a lawful act without due caution or circumspection, involuntarily kill another, such person shall be deemed guilty of manslaughter": B. & C. Comp. § 1746.

In Blashfield on Instructions to Juries, page 440, it is stated: "Error cannot be predicated upon the omission or refusal of a trial judge to instruct as to the lesser grades of the offense charged, where there is no evidence to reduce the offense to a lesser grade." Mr. Justice MOORE has clearly and ably discussed this rule in *State* v. *Magers,* 35 Or. 520 (57 Pac. 197), and briefly and accurately summarized it on page 534 (page 201 of 57 Pac.) of the opinion in that case, as follows: "The rule is well settled that, on a trial of a person for the crime of murder, if there is no evidence tending to reduce the homicide to man-

slaughter, it is not incumbent upon the court to charge in reference to the lesser crime; but, if there is any evidence, direct or indirect, however slight it may be, that tends in any manner to show that the killing was done in the heat of passion, or under such circumstances as to eliminate the element of malice, prejudicial error is committed if the court fail or refuse to instruct the jury upon the law applicable to manslaughter."

Applying this rule to the case at bar, there was no error in refusing to instruct upon the involuntary killing, for there is no evidence in the case upon which to base such an instruction. There is no question as to how the homicide was committed, or the circumstances under which it was done, and the theory of the defense, as shown by the record and brief and arguments on, appeal, that the defendant was so dazed by the blow given him on the head by his son when the latter struck him with the rifle, and so angered by his quarrel with his wife, that he killed her in a sudden heat of passion caused by a provocation sufficient to make the passion irresistible, does not tend in any way to reduce the offense to involuntary killing. If, as contended by counsel for defendant, the blow on defendant's head dazed and blinded him, and while so dazed and blinded, without knowing exactly what he did or why he did it, he secured a loaded revolver from a trunk in an adjoining room and pursued his son Robert with the pistol, and while so dazed and excited, in hot blood, upon the occasion, killed his wife, not realizing what he had done until the next day, such circumstances would not warrant the instruction refused upon involuntary killing. There is no element of involuntary killing, as defined in the instruction refused, in the evidence in this case, nor any circumstances from which it might be inferred. The evidence of the homicide and the manner in which it was done is not circumstantial, but the positive, direct testimony of the witnesses who saw it committed. There is nothing in the case that could possibly warrant any other instructions upon the grades of the offense than those given, of murder in the first and second degrees, and voluntary manslaughter.

15. The next instruction refused related to the definitions of deliberation and premeditation, and undertook to explain in connection therewith the law as to the time necessary for deliberation and premeditation. In the general charge the court defined deliberation and premeditation as given by this court in *State* v. *Ah Lee*, 8 Or. 214, and afterwards approved in *State* v. *Carver*, 22 Or. 602, 605 (30 Pac. 315), and instructed the jury in connection therewith:

"Deliberation and premeditation must be evidenced by some proof that the design was formed and matured in cool blood and not hastily upon the occasion. Unless the design to take life be formed and matured in cool blood and not hastily upon the occasion, there is not murder in the first degree. There is no definite space of time, however, fixed by law which must elapse between the formation of the intention to kill and the act of killing to constitute murder in the first degree. The question of time for the blood to cool is one of the facts for the jury to determine from the evidence adduced on the trial, which should satisfy the jury beyond a reasonable doubt."

This case is not like the case of *State* v. *Morey*, 25 Or. 241 (35 Pac. 655, 36 Pac. 573), where there was no evidence of any passion or excitement prior to the act of killing, and in which case the court said: "It cannot be said, as a matter of law, that any given space of time would afford an opportunity to a given person for deliberation and premeditation, if there is any question as to whether his mind was so disqualified or disturbed. In such case the question as to whether there had been sufficient cooling time, and whether the mind was in a condition to deliberate and premeditate, would be for the jury to determine and not the court." There being some evidence in the case at bar that the mind of the defendant had been disturbed shortly prior to the killing, the court very properly left the matter of time for deliberation and premeditation to be determined by the jury, in accordance with the rule declared in *State* v. *Morey*, 25 Or. 241, 246 (35 Pac. 655, 36 Pac. 573).

It is insisted that the fifteenth and seventeenth instructions refused were necessary to explain Section 1754, B. & C. Comp.,

49 OR,— 18

and distinguish between murder in the first and second degree and manslaughter. These matters were sufficintly covered by the general charge, and particularly by 8, 24, 25, 26, 27, 28 and 31 of the instructions given. The eighteenth and nineteenth instructions refused were obscure and involved, and the criminal intent attempted to be described therein was sufficiently detailed in the twenty-ninth, thirtieth and thirty-first instructions given, while the twentieth, twenty-second, twenty-third and twenty-fourth instructions refused were covered by the eighteenth, nineteenth, twentieth and twenty-first instructions given.

16. The twenty-first instruction refused began by saying:

"The killing, however, which constitutes manslaughter must be either voluntarily committed in the commission of an unlawful act, or a lawful act without due action (caution?) or circumspection."

It then proceeded to define a killing upon a˙ sudden heat of passion, and to give the meaning the latter term. As the very first sentence of this instruction was inapplicable to the facts in this case as heretofore shown, the refusal of the entire instruction was proper: I Blashfield, Inst. to Juries, § 338.

17. The twenty-fifth and twenty-eighth instructions requested were cautionary, and it was within the discretion of the court to give them or not, so long as there was nothing in the circumstances of the case that made them necessary. The first related to the duty of the jury to keep their judgment in suspense until every fact was carefully examined, and its just weight and bearing faithfully determined, and the second cautioned the jury not to consider the feelings or desires of the community regarding the case in arriving at a verdict. There is nothing in the record to show want of care on the part of the jury, or that there was any feeling or desire for any particular verdict by the community, or any feeling whatever on the part of the community in regard to the result of the case. The homicide was committed almost six months prior to the trial, at a point some 20 miles distant from the place of the trial, and we see no necessity for giving the instructions requested, and it was not

error to refuse them : 1 Blashfield, Inst. to Juries, p. 760, § 344. The twenty-sixth and twenty-seventh instructions requested were covered by the forty-second and forty-first, respectively, of the instructions given.

18. The twenty-ninth instruction requested was to the effect that the evidence was not sufficient to prove murder in the first degree, in that it was insufficient to prove deliberation and premeditation. It is sufficient to say there was ample evidence upon these points to submit them to the jury as the court did under proper instructions. It is contended, however, that the evidence shows positively and conclusively that whatever design, purpose or intent the defendant had at the time he killed his wife was formed upon the occasion, in hot blood, under circumstances of extreme provocation, without any deliberation or premeditation. When it is recalled that the defendant, after being struck on the head with the rifle barrel by his son, went into an adjoining room, secured a revolver from a trunk there, and chased his son for 100 yards down the field firing three times at him, and then turned around and followed his wife for 300 yards to overtake her, and, as both the son and daughter say, raised his pistol and pointed it at her before shooting her, then deliberately walked away and went to the doctor to have the wound on his head examined, and told the doctor he had shot and "hit" or "hurt" his wife, it is readily seen that to have given the requested instruction would have been a direct violation of the law laid down by this court in *State* v. *Morey*, 25 Or. 241, 246 (35 Pac. 655, 36 Pac. 573), where it said: "As the power to deliberate or premeditate is possessed only by those having a mind free from passion or excitement, it cannot be said, as a matter of law, that any given space of time would afford an opportunity to a given person for deliberation or premeditation, if there is any question as to whether his mind was so disqualified or disturbed. In such case the question as to whether there had been sufficient cooling time, and whether the mind was in a condition to deliberate and premeditate, would be for the jury to determine and not the court."

It was, therefore, a question of fact for the jury to determine whether there was sufficient provocation to cause a sudden heat of passion, and also, if there had been such provocation and resulting passion, whether there had been sufficient cooling time, and whether his mind was in a condition to deliberate and premeditate, and these were questions which the court could not decide as matters of law under the evidence in this case. The instruction was, therefore, properly refused. This court in *State* v. *Carver*, 22 Or. 602, 604 (30 Pac. 316), speaking by Mr. Justice BEAN, present Chief Justice, said: "To raise the crime to the higher grade of murder in the first degree, there must be some proof that the act was committed of deliberate and premeditated malice. This proof need not be express or positive. It may be inferred from the circumstances." From the evidence in this case, there is no question that the defendant killed his wife, and, considering all the attendant circumstances connected therewith as disclosed by the record, the jury was justified in finding that he did so of deliberate and premeditated malice as charged in the indictment.

We have carefully considered the exceptions taken to the instructions given by the court, and all other assignments of error in this case, and, considering the instructions as a whole, we think they are substantially correct, and could not have misled the jury to the prejudice of the defendant, and that no substantial error was committed in the trial of the case. Fully realizing the serious consequences to the defendant of upholding the judgment against him, we are, nevertheless, compelled to declare that he had a full, fair and impartial trial under the laws of this state, in which his rights were fully protected by able counsel, and, there being no error, the judgment of the lower court is affirmed.                    AFFIRMED.