Argued January 18, affirmed February 25, petition for rehearing
denied April 27, petition for review denied June 15, 1971

## STATE OF OREGON, *Respondent, v.*
## BOBBY JOE SMALLWOOD, *Appellant.*

481 P2d 378

*Gerald R. Pullen,* Portland, argued the cause and filed the brief for appellant.

*J. Bradford Shiley, Jr.,* Special Assistant to the Attorney General, Salem, argued the cause for re-

spondent. With him on the brief were Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

LANGTRY, J.

Defendant appeals from conviction of first degree murder for the slaying of his former wife.

The two assignments of error are (1) that a motion for mistrial should have been granted because a police officer testified that when defendant was arrested for a trespass in his former wife's home some 10 months before the killing, defendant was carrying a concealed knife, and (2) that there was an error in the court's instruction concerning first degree murder.

Evidence disclosed: The couple was divorced in March 1968. Decedent lived with their children in a rented house in Portland. In April 1969, defendant had imposed himself upon the household and was evicted by the police at decedent's request, and warned if he returned that he would be charged with trespass. Several days later he did return and was charged with trespass, then remained away for several months. The shooting, which occurred on February 15, 1970, was preceded by several weeks during which the defendant was back in the decedent's home without her taking any action to evict him. Relations between him and decedent were strained.

Testimony from some of their boys indicates that on February 15, 1970, there was quarreling between the decedent and defendant. Defendant asked

decedent several times whether she loved him, and said something about "last chance" several times. Shortly thereafter, defendant came into the basement where the boys had several rifles in a locked box. Fourteen-year-old Mark, who knew the combination to the lock, was in the basement. Defendant sought to have Mark open the box, was refused, and started breaking into the box. Mark opened it. The defendant was either removing or had just removed a 30.06 rifle from the box, and was finding bullets for it, when the decedent came into the basement. She told Mark that he did not need to open the box for defendant and went back upstairs. Defendant loaded the gun and Mark called the decedent. She came back. Defendant pointed the gun at her and pulled the trigger, but it did not fire. Mark told his mother to "go and call the cops." She went upstairs and defendant took the basement extension phone off the hook. Then defendant started upstairs. Mark testified:

"A　\* \* \* He \* \* \* said \* \* \* I'm going to kill her. I grabbed my lock and we were walking upstairs and I was looking for the gun to go to the shoulders and then—I expected it to go to the shoulders and I was going to jump him then but he never went to the shoulders, he pushed the door open and shot it from the—the gun was by his side.

"Q　The hip?

"A　Yah.

"Q　Did you see your mother before the gun was fired?

"A　Yes.

"Q　What was she doing?

"A　Walking towards me.

"Q　Where were her hands?

"A　On her side—down by her sides.

"Q Were her hands up here—(indicating)?

"A They were down by her sides? [sic]"

The defendant testified that decedent carried a .25 caliber Bereta revolver in her brassiere, and on the day in question he thought that she had it there. He claimed that earlier in the day she had made a motion at him as though she had a gun in her pocket and was going to shoot him; that when she was in the basement and he had the rifle in his hands, she swore at him and said that she could kill him before he took two steps. He said that when she went upstairs he could hear her footsteps going toward the bedroom (where the upstairs telephone was), and he thought she was going then to get the Bereta or load it, and that she was coming back to kill him. When he came to the top of the steps and opened the door, she was coming toward him and her hand went toward her brassiere and being afraid she would shoot him, he shot in self-defense. Some of this testimony was glaringly inconsistent with statements he had voluntarily made to police officers after the shooting. Other evidence indicated that decedent did at one time have a Bereta revolver, but that she probably had not had it in her possession for several months, having disposed of it. She carried no weapon at the time of her death.

■ ■ The officer who testified about the trespass arrest on April 2, 1969, said:

"Q And following the arrest what did you do?

"A We took him outside and searched him for weapons and we found a—

"MR. PULLEN: Your Honor—Well, go ahead —I was going to make a fast objection, I won't.

"THE COURT: All right, proceed.

"A   We searched him for weapons outside and found a seven inch long kitchen butcher knife wrapped in foil in his waist band and he was charged by us with this."

After a little more testimony from this witness, the court dismissed the jury for a weekend recess. A colloquy with counsel ensued, the report of which covers some 10 pages of the transcript. During this colloquy, defense counsel renewed an earlier motion for mistrial on another matter, but he said nothing about the testimony quoted above. When the court resumed on Monday morning, defense counsel moved for a mistrial on the ground that the testimony quoted above was not relevant, referred to an unrelated crime, and was prejudicial. Court said to counsel:

"THE COURT: Why didn't you object at that time, Mr. Pullen?

"MR. PULLEN [Defense Counsel]: Because I wasn't sure just what would be elicited."

Following further colloquy between the court and counsel, the court said, among other things:

"THE COURT: Of course this—at the moment when Mr. Field was testifying, in my own mind, I had a question but I assumed that  *   *   * [defense counsel] felt it was either helpful to his side of the case or at least felt it was admissible because he didn't object  *   *   *.

"*   *   *   *   *

"THE COURT: Well, it takes the court by surprise. In view of the situation we are going to go ahead, the motion will be denied."

At oral argument in this court, the attorney general conceded that the officer's testimony with ref-

erence to the knife was error. We do not necessarily agree that it was error. But we do not consider that question, because we agree with the attorney general's contention that the motion for mistrial was not timely made.

Counsel had adequate opportunity to make an objection to the question and then to move for mistrial immediately after the answer was given. Counsel started an objection and then withdrew it, misleading the trial judge. Granting of a mistrial is discretionary with the trial court and will not be disturbed unless the rights of the defendant are seriously prejudiced.

In *State v. Shafer*, 222 Or 230, 235, 351 P2d 941 (1960), the court said:

"* * * The time to move for a mistrial is when the allegedly prejudicial act occurs, not after the incident has been allowed to pass by, for then it is too late for the trial judge to caution the jury and mend the harm."

This is a first degree murder conviction. We could invoke the provisions of Rule 5.40[1] if there was reasonable doubt in our minds that the challenged testimony prejudiced defendant's case. See *State v. Andrews*, 2 Or App 595, 469 P2d 802 (1970), and *State v. Abel*, 241 Or 465, 474, 406 P2d 902 (1965). The strong evidence against defendant which we have reviewed leaves the case in such a posture that it does not warrant such consideration.[2]

---

[1] "Rule 5.40
"ERRORS CONSIDERED
"* * * [T]hat the court reserves the right to take notice of an error of law apparent on the face of the record."

[2] See Harrington v. California, 395 US 250, 287-88, 89 S Ct 1726, 23 L Ed 2d 284 (1969), and Chapman v. California, 386 US

■ ■ The defendant complains that the court did not give Oregon State Bar Uniform Jury Instruction No. 240.03, which he requested.⑨ Specifically, he claims that the first degree murder instruction which the court gave did not instruct that a deliberate and premeditated design to kill must precede the killing by some appreciable length of time—that the design must be formed while the mind is in its normal state, and under control. *State v. Morey*, 25 Or 241, 244, 35 P 655, 36 P 573 (1894).

The substance of the requested instruction was adequately covered in instructions given. The court was more painstaking in defining deliberation and premeditation than were the drafters of the Uniform Jury Instructions. A part of the court's instruction was:

"* * * The intent to kill must be the result of deliberation and must have been formed upon * * * reflection and not under heat of passion or

18, 21-25, 87 S Ct 824, 17 L Ed 2d 705, 24 ALR 3d 1065, *reh. denied* 386 US 987 (1967); State v. Naughten, 5 Or App 6, 480 P2d 448 (1971).

⑨ The paragraph of the instruction requested and in question is:

"Deliberation and premeditation must be shown by some proof (of poisoning or lying in wait or) that the design to commit the act was formed and matured in cool blood and not hastily upon the occasion. The design to kill must be formed and mature while the mind is in its normal state and under control. The deliberate and premeditated design to kill must precede the killing by a length of time sufficient for reflection and consideration upon the matter and the formation of a definite purpose to kill. It is not necessary that the deliberate intent to kill be formed any specific length of time prior to the commission of the act." Uniform Jury Instruction No. 240.03.

other conditions such as precludes the idea of deliberation.

"\* \* \* \* \*

"\* \* \* [R]ash impulse is not such deliberation \* \* \*."

The court's instruction met the *Morey* standard.

Affirmed.